## BUMPER *v.* NORTH CAROLINA.

No. 1016.   Argued April 24–25, 1968.—Decided June 3, 1968.

*Norman B. Smith* argued the cause and filed briefs for petitioner, *pro hac vice.*

*Harry W. McGalliard,* Deputy Attorney General of North Carolina, argued the cause for respondent. With him on the brief was *T. W. Bruton,* Attorney General.

Briefs of *amici curiae* were filed by *Jack Greenberg, James M. Nabrit III, Michael Meltsner, Leroy D. Clark, Norman C. Amaker,* and *Charles S. Ralston* for the NAACP Legal Defense and Educational Fund, Inc., et al., and by *F. Lee Bailey, pro se.*

MR. JUSTICE STEWART delivered the opinion of the Court.

The petitioner was brought to trial in a North Carolina court upon a charge of rape, an offense punishable in that State by death unless the jury recommends life imprisonment.[1] Among the items of evidence introduced by the prosecution at the trial was a .22-caliber rifle allegedly used in the commission of the crime. The jury found the petitioner guilty, but recommended a sentence of life imprisonment.[2] The trial court imposed that sentence, and the Supreme Court of North Carolina affirmed the judgment.[3] We granted certiorari[4] to consider two separate constitutional claims pressed unsuccessfully by the petitioner throughout the litigation in the North Carolina courts. First, the petitioner argues that his constitutional right to an impartial jury was violated in this capital case when the prosecution was permitted to challenge for cause all prospective jurors who stated that they were opposed to capital punishment or had con-

---

[1] "Every person who is convicted of ravishing and carnally knowing any female of the age of twelve years or more by force and against her will, or who is convicted of unlawfully and carnally knowing and abusing any female child under the age of twelve years, shall suffer death: Provided, if the jury shall so recommend at the time of rendering its verdict in open court, the punishment shall be imprisonment for life in the State's prison, and the court shall so instruct the jury." N. C. Gen. Stat. § 14-21 (1953).

[2] The petitioner was also convicted upon two charges of felonious assault and sentenced to consecutive 10-year prison terms.

[3] 270 N. C. 521, 155 S. E. 2d 173.

[4] 389 U. S. 1034.

scientious scruples against imposing the death penalty. Secondly, the petitioner contends that the .22-caliber rifle introduced in evidence against him was obtained by the State in a search and seizure violative of the Fourth and Fourteenth Amendments.

## I.

In *Witherspoon* v. *Illinois, ante,* p. 510, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been excluded for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in *Witherspoon* does not govern the present case, because here the jury recommended a sentence of life imprisonment. The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. *Duncan* v. *Louisiana, ante,* p. 145; *Turner* v. *Louisiana,* 379 U. S. 466, 471–473; *Irvin* v. *Dowd,* 366 U. S. 717, 722–723. We cannot accept that contention in the present case. The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily "prosecution prone," [5] and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon.*[6] Accordingly, we decline to reverse the judgment of conviction upon this basis.

---

[5] He did submit affidavits to the North Carolina Supreme Court referring to studies by W. C. Wilson and F. J. Goldberg, see *Witherspoon* v. *Illinois, ante,* at 517, n. 10. The court made no findings with respect to those studies and did not mention them in its opinion.

[6] In addition to the materials mentioned in *Witherspoon, ante,* at 517, n. 10, the petitioner's brief in this Court cites an unpublished

## II.

The petitioner lived with his grandmother, Mrs. Hattie Leath, a 66-year-old Negro widow, in a house located in a rural area at the end of an isolated mile-long dirt road. Two days after the alleged offense but prior to the petitioner's arrest, four white law enforcement officers—the county sheriff, two of his deputies, and a state investigator—went to this house and found Mrs. Leath there with some young children. She met the officers at the front door. One of them announced, "I have a search warrant to search your house." Mrs. Leath responded, "Go ahead," and opened the door. In the kitchen the officers found the rifle that was later introduced in evidence at the petitioner's trial after a motion to suppress had been denied.

At the hearing on this motion, the prosecutor informed the court that he did not rely upon a warrant to justify the search, but upon the consent of Mrs. Leath.[7] She testified at the hearing, stating, among other things:

"Four of them came. I was busy about my work, and they walked into the house and one of them walked up and said, 'I have a search warrant to search your house,' and I walked out and told them to come on in. . . . He just come on in and said he had a warrant to search the house, and he didn't

dissertation by R. Crosson, An Investigation Into Certain Personality Variables Among Capital Trial Jurors (Western Reserve University, January 1966), involving a sample of 72 jurors in Ohio.

[7] "THE COURT: There is a motion here that says the property [was] seized against the will of Mrs. Hattie Leath and without a search warrant. Now, the question is, are we going into the search warrant?

"MR. COOPER: The State is not relying on the search warrant.

"THE COURT: Are you stating so for the record?

"MR. COOPER: Yes, sir."

read it to me or nothing. So, I just told him to come on in and go ahead and search, and I went on about my work. I wasn't concerned what he was about. I was just satisfied. He just told me he had a search warrant, but he didn't read it to me. He did tell me he had a search warrant.

.          .          .          .          .

". . . He said he was the law and had a search warrant to search the house, why I thought he could go ahead. I believed he had a search warrant. I took him at his word. . . . I just seen them out there in the yard. They got through the door when I opened it. At that time, I did not know my grandson had been charged with crime. Nobody told me anything. They didn't tell me anything, just picked it up like that. They didn't tell me nothing about my grandson." [8]

Upon the basis of Mrs. Leath's testimony, the trial court found that she had given her consent to the search, and

---

[8] She also testified, at another point:

"I had no objection to them making a search of my house. I was willing to let them look in any room or drawer in my house they wanted to. Nobody threatened me with anything. Nobody told me they were going to hurt me if I didn't let them search my house. Nobody told me they would give me any money if I would let them search. I let them search, and it was all my own free will. Nobody forced me at all.

.          .          .          .          .

"I just give them a free will to look because I felt like the boy wasn't guilty."

The transcript of the suppression hearing comes to us from North Carolina in the form of a narrative; i. e., the actual questions and answers have been rewritten in the form of continuous first person testimony. The effect is to put into the mouth of the witness some of the words of the attorneys. In the case of an obviously compliant witness like Mrs. Leath, the result is a narrative that has the tone of decisiveness but is shot through with contradictions.

denied the motion to suppress.[9]   The Supreme Court of North Carolina approved the admission of the evidence on the same basis.[10]

The issue thus presented is whether a search can be justified as lawful on the basis of consent when that "consent" has been given only after the official conducting the search has asserted that he possesses a warrant.[11] We hold that there can be no consent under such circumstances.

When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given.[12]   This burden cannot be discharged by

---

[9] "The Court finds that from the evidence of Mrs. Hattie Leath that it is of a clear and convincing nature that she, the said Mrs. Hattie Leath, voluntarily consented to the search of her premises, as is more particularly set forth in her evidence, and that that consent was specifically given and is not the result of coercion from the officers."

[10] That court also stated: "The fact that [the search] did reveal the presence of the guilty weapon . . . justifies the search. . . . [The petitioner's] rights have not been violated.   Rather, his wrongs have been detected."   270 N. C., at 530–531, 155 S. E. 2d, at 180.

Any idea that a search can be justified by what it turns up was long ago rejected in our constitutional jurisprudence.   "A search prosecuted in violation of the Constitution is not made lawful by what it brings to light . . . ."   *Byars* v. *United States,* 273 U. S. 28, 29.   See also *United States* v. *Di Re,* 332 U. S. 581, 595; *Henry* v. *United States,* 361 U. S. 98, 103.

[11] Mrs. Leath owned both the house and the rifle.   The petitioner concedes that her voluntary consent to the search would have been binding upon him.   Conversely, there can be no question of the petitioner's standing to challenge the lawfulness of the search.   He was the "one against whom the search was directed," *Jones* v. *United States,* 362 U. S. 257, 261, and the house searched was his home. The rifle was used by all members of the household and was found in the common part of the house.

[12] *Wren* v. *United States,* 352 F. 2d 617; *Simmons* v. *Bomar,* 349 F. 2d 365; *Judd* v. *United States,* 89 U. S. App. D. C. 64, 190 F. 2d 649; *Kovach* v. *United States,* 53 F. 2d 639.

showing no more than acquiescence to a claim of lawful authority.[13]   A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid.[14]   The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant,

[13] See, *e. g., Amos* v. *United States,* 255 U. S. 313, 317; *Johnson* v. *United States,* 333 U. S. 10, 13; *Higgins* v. *United States,* 93 U. S. App. D. C. 340, 209 F. 2d 819; *United States* v. *Marra,* 40 F. 2d 271; *MacKenzie* v. *Robbins,* 248 F. Supp. 496.

[14] "Orderly submission to law-enforcement officers who, in effect, represented to the defendant that they had the authority to enter and search the house, against his will if necessary, was not such consent as constituted an understanding, intentional and voluntary waiver by the defendant of his fundamental rights under the Fourth Amendment to the Constitution." *United States* v. *Elliott,* 210 F. Supp. 357, 360.

"One is not held to have consented to the search of his premises where it is accomplished pursuant to an apparently valid search warrant.   On the contrary, the legal effect is that consent is on the basis of such a warrant and his permission is construed as an intention to abide by the law and not resist the search under the warrant, rather than an invitation to search." *Bull* v. *Armstrong,* 254 Ala. 390, 394, 48 So. 2d 467, 470.

"One who, upon the command of an officer authorized to enter and search and seize by search warrant, opens the door to the officer and acquiesces in obedience to such a request, no matter by what language used in such acquiescence, is but showing a regard for the supremacy of the law. . . .   The presentation of a search warrant to those in charge at the place to be searched, by one authorized to serve it, is tinged with coercion, and submission thereto cannot be considered an invitation that would waive the constitutional right against unreasonable searches and seizures, but rather is to be considered a submission to the law." *Meno* v. *State,* 197 Ind. 16, 24, 164 N. E. 93, 96.

See also *Salata* v. *United States,* 286 F. 125; *Brown* v. *State,* 42 Ala. App. 429, 167 So. 2d 281; *Mattingly* v. *Commonwealth,* 199 Ky. 30, 250 S. W. 105.   Cf. *Gibson* v. *United States,* 80 U. S. App. D. C. 81, 149 F. 2d 381; *Naples* v. *Maxwell,* 271 F. Supp. 850; *Atwood* v. *State,* 44 Okla. Cr. 206, 280 P. 319; *State* v. *Watson,* 133 Miss. 796, 98 So. 241.

or fails to show that there was, in fact, any warrant at all.[15]

When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent.

We hold that Mrs. Leath did not consent to the search, and that it was constitutional error to admit the rifle in evidence against the petitioner. *Mapp* v. *Ohio,* 367 U. S. 643. Because the rifle was plainly damaging evidence against the petitioner with respect to all three of the charges against him, its admission at the trial was not harmless error. *Chapman* v. *California,* 386 U. S. 18.[16]

---

[15] During the course of the argument in this case we were advised that the searching officers did, in fact, have a warrant. But no warrant was ever returned, and there is no way of knowing the conditions under which it was issued, or determining whether it was based upon probable cause.

[16] It is suggested in dissent that "[e]ven assuming . . . that there was no consent to search and that the rifle . . . should not have been admitted into evidence, . . . the conviction should stand." This suggestion seems to rest on the "horrible" facts of the case, and the assumption that the petitioner was guilty. But it is not the function of this Court to determine innocence or guilt, much less to apply our own subjective notions of justice. Our duty is to uphold the Constitution of the United States.

In view of the discursive factual recital contained in the dissenting opinion, however, an additional word may be in order. There can be no doubt that the crimes were grave and shocking. There *can* be doubt that the petitioner was their perpetrator. The crimes were committed at night. When, at first, the victims separately viewed a lineup that included the petitioner, each of the victims identified the same man as their assailant. That man was *not* the petitioner. Later, the victims together viewed another lineup, and every man in the lineup was made to speak *his name* for "voice identification." This time the victims identified the petitioner as their assailant. At

The judgment of the Supreme Court of North Carolina is, accordingly, reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE DOUGLAS joins Part II of the opinion of the Court. Since, however, the record shows that 16 of 53 prospective jurors were excused for cause because of their opposition to capital punishment, he would also reverse on the ground that petitioner was denied the right to trial on the issue of guilt by a jury representing a fair cross-section of the community. *Witherspoon* v. *Illinois, ante,* at 523 (separate opinion). Under North Carolina law, rape is punishable by death unless the jury recommends life imprisonment. N. C. Gen. Stat. § 14–21 (1953). But an indictment for rape includes the lesser offense of an assault with intent to commit rape, and the court has the duty to submit to the jury the lesser degrees of the offense of rape which are supported by the evidence. *State* v. *Green,* 246 N. C. 717, 100 S. E. 2d 52 (1957). See N. C. Gen. Stat. §§ 15–169, 15–170 (1953). These include assault with intent to commit rape, for which the range of punishment is one to 15 years' imprisonment (N. C. Gen. Stat. § 14–22), and assault (N. C. Gen. Stat. § 14–33). In the instant case, the trial judge did in fact charge the jury with respect to these lesser offenses.

MR. JUSTICE HARLAN, concurring.

While I join in the judgment of the Court and in Part II of its opinion, I am prompted to add a brief note.

the time of the lineups a local newspaper had reported that a man named Wayne Bumper was being held by the sheriff as the "prime suspect" in the case, and at least one of the victims knew of that fact. Earlier both victims had been shown a collection of photographs. One victim identified a picture of the petitioner; the petitioner's name was written on the back of the photograph.

I share, as I am sure every member of the majority does, MR. JUSTICE BLACK's abhorrence of the brutal crime of which petitioner stands convicted. To avoid any misapprehension, I wish to make it perfectly clear that reversal of this conviction is not a "penalty" imposed on the State for infringement of federal constitutional rights. Reversal by this Court results, as always, only from a decision that petitioner was not constitutionally proved guilty and hence there is no legally valid basis for imposition of a penalty upon him.

In determining whether a criminal defendant was convicted "according to law," the test is not and cannot be simply whether this Court finds credible the evidence against him. Crediting or discrediting evidence is the function of the trier of fact, in this case a jury. The jury's verdict is a lawful verdict, however, only if it is based upon evidence constitutionally admissible. When it is not, as it is not here, reversal rests on the oldest and most fundamental principle of our criminal jurisprudence—that a defendant is entitled to put the prosecution to its lawful proof.

The evidence against petitioner consisted in part of a gun that he alleged was unlawfully taken from the home of Mrs. Leath, where petitioner was living. The State contended that Mrs. Leath had consented to the search of her home. However, this "consent" was obtained immediately after a sheriff told Mrs. Leath that he had a search warrant, that is, that he had a lawful right to enter her home with or without consent. Nothing Mrs. Leath said in response to that announcement can be taken to mean that she considered the officers welcome in her home with or without a warrant. What she would have done if the sheriff had not said he had a warrant is, on this record, a hypothetical question about an imaginary situation that Mrs. Leath never faced.

Of course, if the officers had a valid search warrant, no consent was required to make the search lawful. There was a search warrant in this case, and it remains possible that this warrant was issued under circumstances meeting all the requirements of the Federal Constitution. Consequently, if this were a situation where a state court had simply chosen the wrong line of constitutional analysis of this search, I would vote to remand the case to give the prosecution an opportunity to justify the search on proper grounds. However, as noted by the Court, the prosecution here explicitly and repeatedly renounced any reliance on the warrant. Like all other parties to lawsuits, a prosecutor has an obligation to the courts (including this Court) and to other parties to present its claims at the earliest appropriate time, and to create an adequate record. Cf. *Ciucci* v. *Illinois*, 356 U. S. 571, 573 (separate note of Mr. Justice Frankfurter and MR. JUSTICE HARLAN).

Finally, if I were persuaded that the admission of the gun was "harmless error," I would vote to affirm, and if I were persuaded that it was arguably harmless error, I would vote to remand the case for state consideration of the point. But the question cannot be whether, in the view of this Court, the defendant actually committed the crimes charged, so that the error was "harmless" in the sense that petitioner got what he deserved. The question is whether the error was such that it cannot be said that petitioner's guilt was adjudicated on the basis of constitutionally admissible evidence, which means, in this case, whether the properly admissible evidence was such that the improper admission of the gun could not have affected the result.

I do not think this can be said here. The critical question was the identity of the perpetrator of these crimes. The State introduced eyewitness identification of petitioner by his two victims, and a gun with which there

was evidence these victims were shot, together with testimony that it had been found in petitioner's place of abode. The jury could, of course, have found the testimony of the victims credible beyond a reasonable doubt, and convicted petitioner on this basis alone. But it might well not have. The addition of a tangible cross-check linking petitioner with the crime can hardly be said, from the judicial vantage point, to have been harmless surplusage.

MR. JUSTICE BLACK, dissenting.

## I.

This case, like *Witherspoon* v. *Illinois, ante,* p. 510, decided today, was brought to this Court primarily to decide the question whether the constitutional rights of a criminal defendant are violated when prospective jurors who state they are opposed to capital punishment or who have conscientious scruples against imposing the death penalty are excluded for cause. As the Court in *Witherspoon* limited its holding to the question of punishment and not of guilt,[1] the jury issue became moot in this case since petitioner had been sentenced to life imprisonment. Ironically, however, this case now becomes about as good an example as can be found of the fallacious assumption of the holding in *Witherspoon.* For the *Witherspoon* decision rests on the premise that a jury "[c]ulled of all who harbor doubts about the wisdom of capital punishment" is somehow prosecution-prone, callous or even lacking in "charity." [2] Yet the jury in this case, from which had been excluded all persons who stated they were opposed to the death penalty, unanimously recommended life imprisonment in a case where, but for their recommendation, the death sentence would

---

[1] See *ante,* at 522, n. 21.

[2] See *ante,* at 520, n. 17.

have been automatic.[3]  And this is a case where the evidence conclusively showed that the accused twice raped a young woman at gunpoint, shot both the woman and her companion while they were tied helplessly to trees with the announced intention of killing them, and left them for dead.  Even with these horrible facts before it, this so-called "prosecution-prone," "callous," and "uncharitable" jury refused to allow imposition of the death penalty and recommended life imprisonment instead.  In these circumstances, where the real reason for granting certiorari in the case has disappeared, it seems to me that the Court should dismiss the petition as improvidently granted.  This is especially true here, where, as I point out at the end of this opinion, there is an open-and-shut case of guilt, and the petitioner received the lightest sentence available under state law.

## II.

Passing over the jury issue, the Court still reverses the conviction in this case and sends it back for a new trial on the ground that the rifle, which the record shows was used to shoot the victims, and which is held by the majority to have been obtained through an unconstitutional search and seizure, was admitted into evidence at petitioner's trial.  One of the reasons that I cannot agree with the Court's reversal is because I believe the searching officers had valid permission to conduct their search.  The facts surrounding the search are these: Petitioner had been raised by his grandmother, Mrs. Hattie Leath, with whom he was living at the time the rape and assaults were committed.  Shortly after the victims were able to recount to the police what had happened to them, the county sheriff, with two of his deputies and a state police officer, went to Mrs. Leath's

---

[3] See N. C. Gen. Stat. § 14–21.  The Court imposed additional sentences of 10 years' imprisonment, to run consecutively, on the two felonious assault charges.

house. One of the deputies went up on the porch of the house and stated to Mrs. Leath, who was standing inside the screen door, that he had a warrant to search her house. He did not appear to have any paper in his hand, and he did not read anything to her. Mrs. Leath's *immediate* response, without mentioning anything about a warrant or asking to see it or read it or have it read to her, was to tell the deputy "to come on in." At the trial Mrs. Leath described her reaction to the visit of the law officers as follows:

> "He did tell me he had a search warrant. I don't know if Sheriff Stockard was with him. I was not paying much attention. I told Mr. Stockard [after he had come up on the porch] to go ahead and look all over the house. I had no objection to them making a search of my house. I was willing to let them look in any room or drawer in my house they wanted to. Nobody threatened me with anything. Nobody told me they were going to hurt me if I didn't let them search my house. Nobody told me they would give me any money if I would let them search. I let them search, and *it was all my own free will.* Nobody forced me at all." (Emphasis added.)

My study of the record in this case convinces me that Mrs. Leath voluntarily consented to this search,[4] and in fact that she actually wanted the officers to search her house—to prove to them that she had nothing to hide. Mrs. Leath's readiness to permit the search was the action of a person so conscious of her innocence, so proud of her own home,[5] that she was not going to require

---

[4] Mrs. Leath's voluntary consent was sufficient to validate the search since she owned the house which was searched and the rifle that was taken. It should also be noted that the rifle was not found in petitioner's private room, nor in any part of the house assigned to him, but in the kitchen behind the door.

[5] Mrs. Leath owned the house in which she was living and throughout her questioning repeatedly referred to "my house."

a search warrant, thus indicating a doubt about the rectitude of her household. There are such people in this world of ours,[6] and the evidence in this case causes me to believe Mrs. Leath is one of them. As she herself testified, "I just give them a free will to look because I felt like the boy wasn't guilty."

Despite the statements of Mrs. Leath cited above, and despite the clear finding of consent by the trial judge, who personally saw and heard Mrs. Leath testify,[7] this Court, refusing to accept Mrs. Leath's sworn testimony that she did freely consent and overruling the trial judge's findings, concludes on its own that she did not consent. I do not believe the Court should substitute what it believes Mrs. Leath should have said for what she actually said—"it was all my own free will." I cannot accept what I believe to be an unwarranted conclusion by the Court.

## III.

Even assuming for the purposes of argument that there was no consent to search and that the rifle which was

---

[6] See *Commonwealth* v. *Tucker*, 189 Mass. 457, 469, 76 N. E. 127, 131. In this case a mother consented for officers who were looking for broken pieces of a knife used in a murder to search her home. The Court found that officers went "to the door of the house where Tucker resided, and stated to his mother, at the outside door of the house, that they had this search warrant to search for the article named therein . . . that she . . . invited the officers to make all the search they desired, saying that she knew her son to be innocent; and thereupon the officers made search, not upon the warrant, but in consequence of her invitation . . . ." The knife blade was admitted against the contention that it was barred by the Fourth and Fourteenth Amendments.

[7] The finding of the court was as follows: "The Court finds that from the evidence of Mrs. Hattie Leath that it is of a clear and convincing nature that she, the said Mrs. Hattie Leath, voluntarily consented to the search of her premises, as is more particularly set forth in her evidence, and that that consent was specifically given and is not the result of coercion from the officers."

seized from Mrs. Leath's house should not have been admitted into evidence, I still believe the conviction should stand.  For the overwhelming evidence in this case, even when the rifle and related testimony are excluded, amply demonstrates petitioner's guilt.  Unfortunately, to show this, it is necessary to go into the sordid facts of the case.  The victims were a young man and his girl friend.  At trial both testified in detail to the following: They were parked shortly after dusk on a country road not far from where the petitioner Bumper lived.  Bumper approached the car, stuck a rifle barrel up to the window and ordered the girl to get out of the car, indicating that if she refused he would shoot her.  Both got out of the car and Bumper ordered the girl to undress, stating that "I want a white girl's p——."  When the girl adamantly refused, Bumper pointed the rifle at the young man, and the girl, understanding that she must submit or her boy friend would be killed, followed Bumper's orders.  Bumper then forced the young man into the rear seat of the car, requiring him to stay down on the floor, while Bumper raped the girl on the back of the car.  A short time after this, Bumper forced the couple to drive to another spot.  Here he made them get out of the car and walk down a dirt road into some bushes.  At this time Bumper told the couple he was going to kill them, and when they pleaded with him to let them go, he replied, "I can't do it; you will go to the cops."  The couple then suggested that if Bumper would tie them up and blindfold them that he could get away with no problem.  This Bumper did, tying each to a separate tree.  But he did not leave.  Instead he raped the girl again while she was tied to the tree.  After this, Bumper went over to the young man and felt his chest, asking him where his heart was and if he was scared.  He then cooly proceeded to shoot the young man where he thought his heart was.  The girl, tied to the tree and

blindfolded, heard the shot, and a moment later herself was shot through the left breast close to her heart. Bumper then took the car and drove away, obviously believing he had killed the young couple. They were able to free themselves, however, and with much difficulty made their way to a nearby house where the owner got them to a hospital.[8] The time during which the couple was held captive was approximately an hour and a half. During that time they clearly got to know who their assailant was. Both got a plain view of Bumper right at the beginning of their ordeal when they opened the car doors and saw his face in the light coming from the inside of the car. Moreover, the undisputed evidence in the record shows that the night of the attack was a bright moonlit night. Both testified positively at trial that it was Bumper.[9] Also there was substantial corroborating evidence outside of that relating to the rifle. Here we have the clear and convincing testimony of the two victims, whose characters were in no way impeached or challenged. The only witnesses at the trial were state

---

[8] It was on these facts and this testimony, it must be remembered, that this jury, selected in the way *Witherspoon* holds is designed to produce a "hanging" jury, recommended a life sentence for petitioner.

[9] The Court's opinion attempts to convey the impression that the victims were not sure of their assailant's identification because of an alleged mistake during a police lineup. See majority opinion, n. 16. This completely overlooks the fact, however, that before Bumper was arrested, and before the victims had any idea of their attacker's name or where he was from, the girl, while still in the hospital, identified Bumper's picture from a number of others. The young man also had identified Bumper's picture days before the lineup was held. After the girl went through the lineup the first time she confessed that she was too scared to look at the men and that she had made no real attempt at identification. And it should not be forgotten that she testified positively under oath at trial that "In my own mind I am certain [that Bumper was my assailant], and nothing could really dissuade me from it. I haven't made up my mind; I know."

witnesses (the two victims plus medical and police testimony), and none of their testimony was refuted or denied in any way. Thus, this is a case where every word of evidence introduced at trial pointed to guilt, and there was no challenge to the truthfulness of the State's evidence, nor to the character of any of its witnesses. Yet even with all this, the Court persists in reversing the case, thus requiring the State to hold a new trial if it wishes to punish Bumper for his crimes.

When it is clear beyond all shadow of a doubt, as here, that a defendant committed the crimes charged, I do not believe that this Court should enforce on the States a *"per se"* rule automatically requiring a new trial in every case where this Court concludes that some part of the evidence was obtained by an unreasonable search and seizure. The primary reason the "exclusionary rule" was adopted by this Court was to deter unreasonable searches and seizures in violation of the Fourth Amendment. *Mapp* v. *Ohio,* 367 U. S. 643. But see my concurring opinion at 661–666. I believe that the deterrence desired by some can be served adequately without blind adherence to a mechanical formula that requires automatic reversal in every case where the exclusionary rule is violated. While little is known about the effect the exclusionary rule really has on actual police practices, I think it is a fair assumption that refusal to reverse a conviction of a defendant, because of the admission of illegally seized evidence, where other evidence conclusively demonstrates his guilt, is not going to lessen police sensitivity to the exclusionary rule, thereby reducing its deterrent effect. Obviously at the time a search is carried out the police are not going to know whether the evidence they hope to obtain is going to be necessary for the prosecution's case, and, of course, if they know it will not be necessary, no search is needed. Thus the only effect of not automatically reversing all cases in which there

has been a violation of the exclusionary rule will be to allow state convictions of obviously guilty defendants to stand. And they should stand.

## IV.

In this case, as I have shown, the evidence of the two victims points positively to guilt without any doubt. When there is added to this the fact that the rifle, from which came the bullets which went into the bodies of the two victims, was found where Bumper lived, which was not far from the scene of the assault, this makes, as the North Carolina Supreme Court pointed out, assurance doubly sure. Whether one views the evidence of guilt with or without the rifle, the conclusion is inescapable that this defendant committed the crimes for which the jury convicted him. In these circumstances no State should be forced to give a new trial; justice does not require it.[10]

Mr. Justice White, dissenting.

When "consent" to a search is given after the occupant has been told by police officers that they have a warrant for the search, it seems reasonable to me for Fourth Amendment purposes to view the consent as conditioned on there being a valid warrant, absent clear proof that the consent was actually unconditional. The evidence in this record does not show unconditional consent with sufficient clarity, and perhaps this would be the result in most cases. But this does not mean that

---

[10] 28 U. S. C. § 2106 provides: "The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had *as may be just under the circumstances.*" (Emphasis added.)

every search following conditional consent is invalid. If upon a motion to suppress or upon an objection to evidence offered at the trial, the State produces a valid warrant for the search, there is no good reason to exclude the evidence simply because police at the time of the search relied on the consent and neither served nor returned the warrant. In the case before us the State represented in this Court that there was a warrant for the challenged search. Unlike the Court and MR. JUSTICE HARLAN, I would not brush this matter aside. Since the existence and validity of the warrant have not been determined in the state courts, the case is not ripe for reversal or affirmance. I would therefore not reverse, but vacate, this conviction, returning the case to the state courts for a determination of the validity of the warrant. If because of the absence of probable cause, or for some other reason, the warrant would not have been a proper predicate for the search, *Mapp* v. *Ohio,* 367 U. S. 643 (1961), would require reversal of the conviction unless it is saved under the harmless-error rule of *Chapman* v. *California,* 386 U. S. 18 (1967).*

---

*Of course, if it was determined that the grandmother's consent was not good against petitioner, who had standing to raise the validity of the search, it would be unnecessary to deal with the issues which have been argued and determined in this case.