Daniel Albert HOCK *v.* STATE of Arkansas

CR 75-123 531 S.W. 2d 701

Opinion delivered January 12, 1976

68

*Holloway & Haddock*, for appellant.

*Jim Guy Tucker*, Atty. Gen., by: *Michael G. Epley*, Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. Appellant Daniel Albert Hock was tried and found guilty of the felonious possession of 24 pounds of marijuana for the purpose and with the intent to sell in violation of Ark. Stat. Ann. § 82-2614.2 (Supp. 1973). For reversal of his three year sentence, he makes the contentions hereinafter discussed.

We find no merit to the contention that his in-custody confession was invalidated because of the officers' failure to give proper *Miranda* warnings. The warning given to appellant, in so far as here applicable, was as follows:

> ". . . You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. You have the right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, *but one will be appointed you, if you wish, if and when you go to Court . . . .*"

Appellant points to *Reed v. State*, 255 Ark. 63, 498 S.W. 2d 877 (1973), and contends that the italicized portion of the warning is deficient. However, in *Moore v. State*, 251 Ark. 436, 472 S.W. 2d 940 (1971), we had before us this same identical warning, and we there pointed out that, while the warning

was deficient to an indigent, it would not be deficient to one who could afford to employ counsel. The record here shows that appellant had funds for the employment of counsel. Consequently, it follows that he is not entitled to complain.

Appellant points to our holding in *Northern* v. *State*, 257 Ark. 549, 518 S.W. 2d 482 (1975), and suggests that the State did not meet its burden of proving the voluntariness of his confession because it did not call all of the officers present when his confession was given. We find no merit to this contention. Appellant failed to offer any testimony that his confession was induced by violence, threats, coercion or offers of reward.

Appellant confessed that he had brought 34 pounds of marijuana with him on his trip and that he had already sold 10 pounds to one Jo Jo Alexander. He contends that such evidence should not have been submitted to the jury because it involved prior crimes. We find no merit to this contention. Such evidence was admissible to show the purpose for which appellant possessed the marijuana — a material element of the crime.

The record shows that prior to contacting appellant, Sheriff Max Brown obtained a search warrant, and that armed with the search warrant, the sheriff with deputies Smith and Talkington went to Lake Chicot State Park looking for the person or persons fitting the descriptions given them by a confidential informant. After finding appellant and his co-defendant and making a search of appellant's automobile and Cabin #5, the sheriff made the following return on the search warrant, to-wit:

No. . . . . .

SEARCH WARRANT
State of Arkansas
County of CHICOT

I have this 20 day of March 1975, made diligent search of the described (time Approx. 4:00 p.m.) premises, and searched Cabin #5 at Chicot State Park

occupied by Daniel A. Hock & Richard Martin Dickman & Black Pont. Auto — belonging to Daniel Hock — found approx. 24 lbs. Marijuana under sink in two suitcases in Cabin #5 Sheriff Returned and filed 20 March 1975.

At trial on May 15, 1975, the State did not rely upon the validity of the search warrant but, instead, relied upon a consent to search. In that connection during an in-chambers hearing it offered the testimony of the sheriff and Deputies Smith and Coalter.

Samuel Smith, Jr., Deputy Sheriff, testified as follows:

"A. Well, we pulled up at this cabin and there was some men working on the building. And, we asked them if the boys were there, or the people there. They said they were down there fishing. We walked down there where they was. The Sheriff introduced us. Told them that he had heard that they had some of that funny stuff, and he wanted to search the building. And, the boys was so calm, to tell you the truth, I started to come back and not even—

Q. Didn't Max have the Search Warrant with him?

A. I presumed he did.

Q. Did you see it?

A. I didn't see him show it to them. No sir.

. . .

Q. Now, Mr. Smith, isn't it true that Max had this Search Warrant in his hand, and said we have a Search Warrant? Didn't he say that?

A. I can't remember. I mean, if he did, I can't remember.

Q. But he did have a Search Warrant in his hand, didn't

he?

A. No, I couldn't say that.

Q. You don't know?

A. I don't know."

Lewis Colater, Deputy Sheriff, testified that he got there late and the search was already in progress when he arrived.

Sheriff Brown testified as follows:

"Q. What happened when you went to the State Park?

A. We got to the State Park, came out in a couple of automobiles. At that particular time of the year, the cabins were being remodeled. Air-conditioning units, and one thing and another, being put in them. And, there was workmen working on nearly all of the cabins, including this particular cabin. And, there was cars and pickup trucks parked all along in front of the cabin. Based on the informant, there was a black automobile involved, and it was parked in front of cabin number five. I asked the workmen if it was occupied, and they said that it was. I asked them where the occupants were, and they advised that they were on the lake bank fishing. Clyde Talkington, Samuel Smith and myself walked down to the lake bank where Daniel Hock and Richard Dickman were standing. Dickman was fishing and Daniel Hock was just standing there with him. I introduced myself to him, and showed him my credentials. I introduced them to Deputy Talkington and Deputy Smith. *Told him that I had information that there might possibly be some marijuana concealed in his cabin or automobile, and asked him if he minded if I looked for it. At that time, he gave me oral permission to search.* I asked him to go to the cabin with me so that he could see just what I was doing. I got back up to the cabin, and at that time Lewis Coalter drove up. He didn't go out there with us, but he came up at that time. He and Deputy Smith searched inside the cabin while Deputy Talkington and myself searched the automobile. Daniel

Hock was very cooperative. He asked if I wanted to look in the turtle hull, and I advised him that I did. He got the keys and opened the turtle hull. We didn't find anything in the car, but before we finished completely searching the car, Deputy Smith came back outside and told us we had better hold him, and that he was going down on the lake bank and pick up Richard Dickman, which he did. I went in the cabin and they found two suit cases full of marijuana under the sink in the cabin. At that time, I advised them of their rights and told them the charges.

Q. You have got on your Search Warrant where you served the Search Warrant and made your Return on it.

A. I returned it back to the J.P. The circumstances and what I found up there, and so forth.

Q. Did you tell Mr. Hock that you had a Search Warrant?

A. No. He never asked for it.

Q. He just told you to go on in and have at it as you pleased?

A. As a matter of fact, if I were a betting man, I would have said at that particular point that there wasn't any marijuana anywhere around, because of his attitude."

In chambers appellant testified on direct examination that the sheriff, after introducing himself, said:

". . . He said he had a search warrant, you know, to search the place. I first asked him if he wanted to search me, and he said no, and he pulled out his search warrant. He pulled it out, and I got a brief look at it, and he stuck it back in his pocket and turned right around and walked, you know, walked off. . . ."

Appellant's cross-examination left much to be desired with respect to credibility.

The latest expression with reference to the burden cast upon the State to show consent to search is contained in *Bumper* v. *North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968), where it is stated:

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all."

The Supreme Court, in *Bumper, supra*, cited *Judd* v. *United States*, 190 F. 2d 649 (D.C. Cir. 1951), favorably as indicating the extent of the burden placed upon the State to show consent. With reference to searches and seizures made without a proper warrant, the Court in *Judd* v. *United States, supra* said:

"Searches and seizures made without a proper warrant are generally to be regarded as unreasonable and violative of the Fourth Amendment. True, the obtaining of the warrant may on occasion be waived by the individual; he may give his consent to the search and seizure. But such a waiver or consent must be proved by clear and positive testimony, and it must be established that there was no duress or coercion, actual or implied. *Amos* v. *United States*, 255 U.S. 313, 41 S. Ct. 266, 65 L. Ed. 654; *United States* v. *Kelih*, D.C.S.D. Ill. 1921, 272 F. 484. The Government must show a consent that is 'unequivocal and specific' (Karwicki v. United States, 4 Cir. 55 F. 2d 225, 226), 'freely and intelligently given.' Kovach v. United States, 6 Cir., 52 F. 2d 639. Thus 'invitations' to enter one's house, extended to armed officers of the law who demand entrance, are usually to be considered as invitations secured by force. *United States* v. *Marquette*, D.C.N.D. Cal. 1920, 271 F. 120. A like view

has been taken where an officer displays his badge and declares that he has come to make a search (*United States v. Slusser*, D.C.S.D. Ohio 1921, 270 F. 818), even where the householder replies 'All right.' *United States* v. *Marra*, D.C.W.D.N.Y. 1930, 40 F. 2d 271. A finding of consent in such circumstances has been held to be 'unfounded in reason'. *Herter* v. *United States*, 9 Cir., 27 F. 2d 521. Intimidation and duress are almost necessarily implicit in such situations; if the Government alleges their absence, it has the burden of convincing the court that they are in fact absent."

The search warrant that the sheriff obtained and upon which he made his return is obviously invalid. Thus, we must determine, under the foregoing decisions, whether the State has met its burden of proving a consent to search — *i.e.* the issue is not whether one should believe either the sheriff or appellant but whether the showing made by the State was sufficiently clear and positive to sustain its burden of proof. On this issue we really have only the testimony of the sheriff and appellant, for Smith, the deputy, could not state positively that the sheriff showed or did not show appellant the search warrant. As between the testimony of the sheriff and appellant, the appellant's testimony is much lacking in credibility. Yet, the return on the search warrant tends to corroborate appellant's version. Based upon the whole record, we cannot say that the State met its burden of proving consent by clear and positive testimony. It follows that the trial court should have suppressed the evidence obtained in the search.

Reversed and remanded.

HARRIS, C. J., and JONES, J., dissent.

J. FRED JONES, Justice, dissenting. It is my opinion that the judgment in this case should be affirmed.

The validity of the search in this case turns on whether the search was conducted with the voluntary consent of the appellant rather than under the search warrant. Sheriff Brown said that although he had the warrant in his posses-

sion, he did not present it to the appellant or use it at all in connection with the search. He said he did not find it necessary to use the search warrant, in that the appellant readily agreed for him to make the search and even assisted in searching the automobile. Sheriff Brown's testimony on this point was confirmed by the testimony of Deputy Sheriffs Smith and Talkington, but this was denied by the appellant. There is no evidence in the record that the appellant had a key to the cabin in which the marijuana was found and there is actually no evidence that any of the appellant's personal effects were in the cabin or as for that matter, that he had even rented the cabin. There was evidence that there were several cabins in the state park and that the appellant's automobile was parked in front of cabin No. 5. Sheriff Brown said the cabin door was unlocked and that workmen were working in, around and on the cabin and no one testified to the contrary. In any event, I conclude that the trial court in resolving this fact issue was justified in believing the sheriff's testimony in regard to the appellant consenting to the search, and that the search was made under such consent. From the testimony of the parties concerned, the court could have easily concluded that it was a part of the appellant's strategy, in concealing the marijuana from detection, to be so entirely agreeable to a search that it would disarm suspicion and lessen the thoroughness of any search made, and that in the event the contraband was found, the appellant could more convincingly deny his knowledge of its existence. From the testimony of the officers it would appear that if such was the strategy of the appellant, it almost succeeded.

On cross-examination Sheriff Brown testified before the jury as follows:

"Q. Sheriff, what cabin did ya'll wind up searching?

A. Number five.

Q. You stated that people were working around that particular cabin?

A. They were. Around, on and in.

Q. Around, on and in? Was the door locked or unlocked?

A. No, it was unlocked.

Q. You state that Mr. Hock voluntarily allowed you to search anything you wanted to?

A. He did.

Q. Why, do you suppose, if he had contraband in his room, he would tell you to go on in and search it?

A. I really don't know sir. I was, at the time he told me, I really didn't think he had anything from his attitude."

Sheriff Brown made a return on the warrant but it only stated where he searched and what he found. It did not say or indicate that he served it on the appellant or showed it to him.

I would affirm.

I am authorized to state HARRIS, C.J., joins this dissent.