THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GARY MOORE, Appellant.

First Department, December 27, 1977

## APPEARANCES OF COUNSEL

*Howard N. Spiegler* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Robert M. Pitler* of counsel *(Peter L. Zimroth* and *Richard Hamburger* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

## OPINION OF THE COURT

SILVERMAN, J. P.

Defendant appeals from a judgment of the Supreme Court, convicting him, after a jury trial, of possession of a weapon as a felony pursuant to former section 265.05 of the Penal Law and criminal possession of a dangerous drug in the fourth degree under former section 220.15 of the Penal Law. He was sentenced on each count to concurrent indeterminate sentences not to exceed a maximum of four years imprisonment. The sentences have been served.

The major issue on this appeal is whether the gun which formed the basis of the possession of a weapon charge should have been suppressed on the ground that it was the product of an illegal search and seizure. We think the trial court acted properly in denying the motion to suppress.

The underlying facts are that on October 31, 1972, at about 11:00 A.M. in a hallway near 117th Street and Lenox Avenue, in the Borough of Manhattan, City of New York, two New York City police officers arrested a man (hereinafter the "informant") for possession of a gun. From the hallway floor, one of the officers picked up over 150 glassine envelopes. The informant begged the police officers to give him a break and stated that he had just come from an apartment where $25,000 worth of narcotics, as well as guns, could be found. He further said that the police must act immediately; that the men were coming that morning to pick up the packages of drugs for distribution. Upon the police strongly expressing their disbelief of him, he several times repeated his statement and offered to go with the police officers to the place and help them get in. The officers called their superior and ultimately five police officers went with the informant to the house

indicated at 65 East 117th Street (a few blocks away). All this took place within one-half hour of the informant's arrest. The informant told the police officers they could get into the apartment by using the name "Willie." Although the informant accompanied the police officers to the building and went up a flight or two of stairs with them, he would not go to the floor where the guns and drugs could be found. Accordingly, the informant stayed on a lower floor of the building, guarded by a police officer, while the other four police officers went up to the floor where Apartment No. 10, the apartment in question, was located. Outside Apartment No. 10, Officer Rentas removed his uniform jacket, his cap and his gun belt, placed his gun in his pocket and his badge in his hand. He stood directly in front of the apartment door. Another officer, Jackson, positioned himself with his back flat against the wall to the left of Apartment No. 10 where he would not be seen by a person standing within the apartment but where he had a clear view of Officer Rentas; the other police officers stayed 12-15 feet away on a landing below. Officer Rentas knocked on the door and in answer to the call "Who's there?" said, "Willie" "Willie who?" "Willie Johnson. Open the door, I'm sick, man." Johnson was apparently a fictitious name, not suggested by the informant.

The door opened half way; Rentas stood there looking startled. At the door was Edgar Davis, a man Rentas recognized because he had previously arrested him for a narcotics violation. Rentas was "shook up" and "panicked for a moment." Officer Jackson observed that Rentas "stopped like he was stunned." Perhaps Officer Rentas was stunned by the realization that his cover had been "blown." Officer Jackson, believing that Officer Rentas might be in danger, rushed past him drawing his gun. Rentas followed. Inside Apartment No. 10 stood defendant Moore pointing a gun at Rentas. Jackson shouted "freeze!" and ordered Moore to put down the gun. Moore backed up a few steps and put the gun in his pocket. Jackson seized the weapon and searched Moore removing 58 glassine envelopes of heroin from Moore's pocket.

Defendant contends that the police had no reasonable basis for coming into the apartment without a search warrant, and that everything after that, including the display of the gun, was the fruit of an illegal search and entry, and that, therefore, the gun and the narcotics should be suppressed.

We do not agree for these reasons:

■ (a) Assuming that the information given by the informant was not sufficient to justify a search without a warrant, that taint was dissipated because of the intervening unlawful act of the defendant in pointing a gun at an apparently unarmed man standing outside the apartment after an occupant had voluntarily opened the door. Thus, "it cannot be said that the weapon was revealed as a direct result of the unlawful nature of the police conduct" but rather the defendant's act of pointing the gun was "unjustified and criminal in nature * * * and unrelated to the initial albeit unlawful action on the part of the police." (People v Townes, 41 NY2d 97, 101-102.) This was a "free and independent action" of the defendant which renders "any 'connection between the lawless conduct of the police and the discovery of the challenged evidence * * * "so attenuated as to dissipate the taint" ' ". (People v Townes, supra, p 102; accord People v Simmons, 55 AD2d 879.)

We note that this is not a case in which the defendant was attempting to protect himself against a presumed burglar. (Indeed Officer Rentas had not yet entered the apartment at the time Officer Jackson came rushing in to protect him.) The occupants of the apartment opened the door to someone who gave a fictitious name and merely said he was sick (in drug parlance meaning he needed drugs), and as Officer Jackson rushed in, he observed defendant pointing a gun.

■ (b) These considerations are particularly important when we deal with a police officer's justifiable concern for the safety of a fellow officer engaged with him in a dangerous police operation. In People v Abruzzi (52 AD2d 499, affd 42 NY2d 813, cert den 434 US 921), the Second Department by a 3-2 vote suppressed evidence of unlawful sexual activity observed by trespassing police officers. The minority believed that surveillance of a policewoman (who was in fact not involved in these sexual activities) justified the trespass. But even the majority said (p 504): "It should be noted that our decision today has neither the intention nor the practical effect of insulating defendants from evidence of criminal activity directed toward a trespassing police officer. In all cases cited by the dissent in support of its independent crime theory, the independent crime was directed toward the police officer himself. As to those kinds of crimes, the testimony of the police officer is undoubtedly admissible, for the Fourth Amendment is not a vehicle for license to commit crimes

against or through the police, regardless of where such crimes occur. Rather, the Fourth Amendment demands that the State shall not benefit by the use of evidence unlawfully obtained." In *People v Evans* (43 NY2d 160, 164) the court distinguished a number of cases which had sustained police intrusions as follows: "In most of these cases the permissible scope of intrusion was justified substantially by the need to ensure the personal safety of the policemen involved."

■ (c) In discussing the framework of analysis for unlawful search and seizure cases, the Court of Appeals in *People v Stewart* (41 NY2d 65, 66), laid down this rule:

"Simply stated the proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether or not that predicate justified the extent of the official intrusion on the individual. Thus, the predicate established defines the scope of permissible police conduct. * * *

"In evaluating the role of the exclusionary rule as a deterrent factor in this area, it is clear that the deterrent effect is directed not at the initial predicate (which can be the amalgam of any number of factors) but at the intensity of the police action."

■ When we are concerned with an apparent immediate threat to the safety of a police officer, it should take very little to justify instant and momentary precautionary action involving harm to no one, whether the stimulus was actual sight of the gun or apprehension that something had frightened his fellow officer.

Perhaps all these considerations are merely facets of the rule of reasonableness: Was there an unreasonable intrusion upon the defendant's reasonable expectation of privacy? As applied to the reasonable expectation of privacy of a defendant who is pointing a gun at an apparently unarmed stranger, who has merely asked to come in, I think the question answers itself. Indeed, it is hard to see how a defendant who points a gun can reasonably expect any legally protectible privacy as to that act; it is neither a legal nor a private act.

Accordingly, we hold that the Trial Justice did not err in refusing to suppress the evidence of the gun and that the conviction for the possession of a weapon should be affirmed.

In the view we have taken, it becomes unnecessary to consider whether the occupants were inviting outsiders for the

purpose of transacting the unlawful business of sale of narcotics thus justifying the ruse and negativing defendant's reasonable expectation of privacy *(Lewis v United States,* 385 US 206, 211); whether indeed the occupants were deceived by the ruse in view of their pointing a gun immediately after, if not simultaneously with the opening of the door; whether there were sufficient indicia of the informant's reliability and truthfulness to justify a search, and an exigency arising out of the likelihood of the disappearance or removal of the contraband that excuses the absence of a warrant.

■ With respect to the conviction for possession of narcotics, once the defendant was arrested for possession of a gun, the police of course had a right to search and such search lawfully discovered the narcotics.

■ However, the defendant was convicted of criminal possession of a dangerous drug in the fourth degree under section 220.15 of the Penal Law as it then read. An essential element of the crime was possession of one-eighth ounce or more of substances containing heroin. Defendant's applications before trial and at the trial for an opportunity to have an independent expert weigh the narcotics were denied. We think that was error at least as to the pretrial application under *People v White* (40 NY2d 797), especially as the claimed weight was so close to the statutory minimum. However, even without proof of possession of that weight of heroin, the defendant would be guilty of the lesser included crime of criminal possession of a dangerous drug, in the sixth degree, a class A misdemeanor, under then section 220.05 of the Penal Law. As the sentence imposed for the narcotics offense was concurrent with that imposed for the weapons offense, and the concurrent sentences have been served, there is obviously no point to ordering a new trial on the narcotics charge and, instead, in the exercise of our powers under CPL 470.15 (subd 2, pars [a] and [c]) we modify the judgment to the extent of reducing the conviction and sentence on the narcotics charge to conviction of criminal possession of a dangerous drug in the sixth degree, a class A misdemeanor, for which a sentence of one year is imposed to run concurrently with the sentence on the weapons conviction. As we have said, those sentences have been served.

The judgment of the Supreme Court, New York County (KAPLAN, J.), entered May 30, 1973, convicting defendant of possession of a weapon as a felony (Penal Law, former § 265.05) and criminal possession of a dangerous drug in the

fourth degree (Penal Law, former § 220.15) should be modified, on the law, by reducing the conviction and sentence on the second count of the indictment from conviction of criminal possession of a dangerous drug in the fourth degree to criminal possession of a dangerous drug in the sixth degree and the sentence on that count reduced to one-year imprisonment running concurrently with the sentence on the first count for possession of a weapon as a felony, and as so modified, affirmed.

 MARKEWICH, J. (concurring). The stenographic record of the suppression hearing reflects that Patrolman Rentas' reaction of fear or shock when the door to Apartment No. 10 opened was induced by his sudden confrontation with someone who knew his true identity and who could betray him. This, in turn, triggered Patrolman Jackson's response by invasion of the apartment to protect his partner. Then Jackson saw the armed defendant for the first time. Even though this was *after* Jackson's trespass upon defendant's privacy, the inducing cause thereof was soundly based on his good faith reaction—so found by the suppression court—to an unknown source of danger within the apartment. Accordingly I agree with my colleague's thesis that Jackson's intrusion was justified in the circumstances.

However, there was no prior "taint" to be "dissipated" by Patrolman Jackson's proper act. The proceedings prior to Rentas' masquerade at the door as "Willie" were unexceptionable. To begin with, no police action at all, either to arrest or to enter Apartment No. 10, was taken on the basis of the previously unknown informant's disclosure. That information alone would not have provided probable cause for either an arrest or a warrantless search, but it did provide a basis for additional police investigation, particularly since they had been warned that time was of the essence. Accordingly, the police endeavored to obtain additional evidence by the deceptive device of bringing about a voluntary opening of the door of the designated apartment in order to see what might be seen. Up to the moment that an occupant voluntarily opened the door to "Willie's" plea, this is all that happened, and was in no sense an invasion of the apartment. That procedure was not rendered illegal *ipso facto* by reason of the bizarre circumstances flowing from Rentas' recognition of the person who had opened the door, and who could have undone him. It was

this unexpected circumstance which opened a new and different path to be followed.

■ It is urged upon us by citation of several cases on the subject, in effect, that all police ruses are illegal. Not so. Not every such device employed by police is an illegal one, the use of which vitiates an arrest. The simplest and commonest ruse of all is the deception practiced by a disguised undercover policeman who poses as a prospective purchaser of contraband. The ruse employed in this case by Rentas was of this kind. Rentas presented himself as Willie, presumably a prospective purchaser of whatever was in the apartment, hoping —as did happen—that someone would voluntarily open the door in answer to his knock. This ruse was not illegal. When the cited cases are read beyond the headnotes, they fall into one pattern: false representations by police of facts which would ordinarily justify the exercise of police authority, which is then voluntarily yielded to by permitting an otherwise improper intrusion by search or in another way. Of course, this "voluntary" consent, brought about by the false statement, is not voluntary at all, and there is actually no consent to exercise of police authority; in such a situation the fruit of the intrusion should be suppressed. One decision after another points this way.

In *People v Jefferson* (43 AD2d 112) police obtained admission to an apartment by falsely stating they were investigating a nonexistent gas leak. In *People v Torres* (45 AD2d 185) when plainclothes police were unable successfully to follow up their observation of the apartment in which defendant was later found with contraband, they obtained entry by summoning uniformed police who were admitted to the apartment by stating falsely at the door that defendant's automobile had been involved in an accident. In *People v Whitehurst* (25 NY2d 389) a police officer, known to and recognized by a defendant whom he had previously arrested, asked, as though officially authorized so to do, the bald question, "What have you got this time?" This assertion of seemingly proper authority was "voluntarily" yielded to by that defendant. The result was suppressed. In *Bumper v North Carolina* (391 US 543) the yielding to police authority was brought about by the policeman's false assertion that he had a search warrant. Denial of suppression was reversed.

■ To be distinguished is *People v Abruzzi* (52 AD2d 499) in which police, observing a defendant doctor's conduct in respect

of an undercover policewoman posing as a patient, invaded the privacy of the defendant doctor. The test is a simple one: "The proper analysis in cases of this nature is to examine the predicate for the police action and then determine whether or not that predicate justified the extent of the official intrusion on the individual." *(People v Stewart,* 41 NY2d 65, 66.)

So examined, it is clear that "the extent of the official intrusion" herein was completely justified. The motion to suppress was properly denied.

EVANS, LANE and MARKEWICH, JJ., concur in an opinion by SILVERMAN, J. P.; SILVERMAN, J. P., EVANS and LANE, JJ., concur in an opinion by MARKEWICH, J.

Judgment, Supreme Court, New York County rendered on May 30, 1973, unanimously modified, on the law, by reducing the conviction and sentence on the second count of the indictment from conviction of criminal possession of a dangerous drug in the fourth degree to criminal possession of a dangerous drug in the sixth degree and the sentence on that count reduced to one-year imprisonment running concurrently with the sentence on the first count for possession of a weapon as a felony, and as so modified, affirmed.