# STATE OF FLORIDA v. FRANCO

## Case No. 84-3215 CF

Seventeenth Judicial Circuit, Broward County

July 31, 1984

### APPEARANCES OF COUNSEL

**Christopher Pole,** Assistant State Attorney for plaintiff.

**Sheldon R. Schwartz** for defendant.

### OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge

Defendant, Gilberto Franco, was arrested at the Ft. Lauderdale Amtrack Train Station on March 21, 1984, after a search of his luggage disclosed a sealed container that, upon later examination, was determined to contain a quantity of cocaine. Subsequent to his arraignment upon a single charge of trafficking in cocaine in an amount in excess of 200 grams but less than 400 grams, a Motion to Suppress was filed. Pursuant to stipulation between the office of the State Attorney

and counsel for the accused, the Court has read the depositions of the arresting officers and has received information relevant to the arrival and departure schedule of the train to New York involved in this case.

## SUMMARY OF TESTIMONY

Detective Gaffney, employed by the Ft. Lauderdale Police Department and assigned to conduct a covert surveillance of the Ft. Lauderdale Amtrack Train Station, testified that he arrived for duty on March 21, 1984, at about 8:15 A.M. Detective Green and Nutt were already at the station when Detective Gaffney arrived.

Defendant Franco was observed to arrive at the station in a taxi cab at about 9:00 A.M., accompanied by a Mr. Fernandez. Both Mr. Franco and Mr. Fernandez, as they alighted from the taxi, and as they entered the train station building where tickets to New York were purchased for cash, seemed to "scan" the area in a more than usual fashion. To a degree not clear in the record, both Mr. Fernandez and Mr. Franco appeared more nervous than the average passenger about to embark upon a train trip. Both of the young men now under surveillance entered the train station building where Mr. Fernandez entered the ticket line for the purpose of purchasing the two tickets to New York, Mr. Franco standing aside and waiting. Once the tickets were obtained from the ticket agent, the young men were observed to repair to the exterior portion of the train station where they took seats on the same bench but at opposite ends thereof. It was the opinion of Detective Nutt that, although there were several persons already seated upon the bench, there was ample room for Mr. Franco and Mr. Fernandez to sit adjacent to each other.

Convinced that Mr. Franco and his companion met at least a portion of the "smuggler's profile", all three detectives approached Mr. Fernandez and introduced themselves as narcotic agents associated with the Broward County Sheriff's Office. Mr. Franco, upon noticing the activity associated with his companion, joined the group and was informed of the identification of the law enforcement officers. The time was now about 9:15 A.M. and the apparent arrival time of the train for New York was scheduled for 9:28 A.M.

Upon agreeing to speak with the officers after they had identified themselves, the two travellers were advised that the reason for the contact with them was the efforts of the officers to interdict the flow of narcotics in this state and a request was made for permission to search their handbags (which constituted all of the observed luggage ascribed to the young men). In response to the request for permission to search, Mr. Fernandez responded, "That's my bag, go ahead and look." Mr.

21

Franco's reply was in similar vein, viz.: "You can look." When the carryon luggage of Mr. Franco was examined, there was found a container wrapped in a fashion that Mr. Gaffney recognized to be consistent with the manner in which cocaine had been wrapped when being transported under similar circumstances in the past. Without opening the package, Mr. Gaffney was unable to confirm his suspicions that the contents thereof would be cocaine; such confirmation was made by a small incision being made in the package and a small quantity of white powder being extracted, which powder, upon later test, was determined to react positively for cocaine.

Before the search of the luggage was commenced, both Mr. Franco and Mr. Fernandez were informed of their right to refuse consent to such search but neither were at any time expressly advised of their right to proceed upon their way if such permission was declined. All of the law enforcement officers testified that the contact with the travellers and the search of their luggage all occurred in the open area of the Ft. Lauderdale Amtrack station; at no time were either of the parties within any type of enclosed structure when the law enforcement officers were interacting with them.

Although Mr. Gaffney did most of the talking with Mr. Franco and his companion, all three law enforcement officers were actively involved in this episode. The depositions of the three officers, upon which this Order is predicated, are in agreement upon all essential facts thereby eliminating the need for detailed analyses herein.

### ANALYSIS OF LAW

It is clear that the focus of the Defendant in his Motion to Supress is upon two issues: (1) whether there was a valid consent to the search of the carry on luggage as a general proposition and (2) whether there was a consent of any kind in reference to the search of the container with the cocaine, in particular.

The law is clear that the burden is upon the State, and a heavy burden it is, to establish the legal justification of every warrantless search. *Bumper v. North Carolina*, 88 S.Ct. 1788 (1968). If consent is alleged as the justification for a warrantless search, the validity of such consent must be demonstrated by clear and convincing evidence. *Bailey v. State*, 319 So.2d 22 (Fla., 1975). Should the evidence reflect that the alleged consent was no more than a submission to apparent police authority, then the claim of consent will fail. *Rawlings v. Kentucky*, 100 S.Ct. 2556 (1980).

In the rapidly changing field of law associated with the Fourth

22

Amendment of the United States Constitution (and, concommitantly, Article I, Section 12 of Florida's Constitution) it is clear more now than ever before that each factual situation presented for analysis is to be viewed from a practical, rather than a hypertechnical, perspective. When search warrants are evaluated for their legal sufficiency upon a Motion to Suppress, the reviewing court is constrained to determine whether the issuing magistrate acted properly, taking into consideration the totality of the circumstances that was presented at the time the search warrant was issued. *Illinois v. Gates*, 100 S.Ct. 2317 (1983). It seems only logical to this Court that the same common sense required in *Illinois v. Gates, supra*, should be applied in those matters wherein travellers are met by law enforcement officers who are attempting to stem the ever increasing flow of contraband in interstate commerce.

Not every meeting between a traveller and a law enforcement officer amounts to the type of intercourse wherein some sort of temporal restraint can be said to have been imposed upon the traveller. If the traveller is informed of the right to refuse permission to search and of the right to continue upon his way, there are no Fourth Amendment constraints with which the Court must reckon. *United States v. Mendenhall*, 446 U.S. 554 (1980). The decision of *Florida v. Royer*, 455 U.S. 986 (1983) did not alter the teachings of *Mendenhall, supra*, even though *Royer* made it abundantly clear that reliance upon the so-called "smuggler's profile", without more, would not be accepted as a legally recognized basis upon which to enforce any kind of custodial restraint upon a traveller. As it is clear from the record now before the Court that the sole reason for the initial contact with Mr. Fernandez and Mr. Franco was the conclusion of the law enforcement officers that the gentlemen in question met at least a portion of the "smuggler's profile", the next task is to determine whether such confrontation precipitated a situation wherein the Fourth Amendment shroud wrapped around Mr. Franco was torn asunder by the police or did he gently remove such shroud himself and thereby make it possible for the cocaine in his carry on luggage to be lawfully retrieved.

The area where the confrontation occurred was open and, in fact, the exact site of the conversation seems to have been at the passenger bench where several persons besides Mr. Franco and Mr. Fernandez had been sitting. Mr. Franco voluntarily came over to the place where Mr. Fernandez was sitting when he was approached by the law enforcement officers. There is no suggestion of the utilization of force by the police other than the subliminal effect that is engendered, in all probability, in almost every instance of police-civilian contact. No evidence exists to reflect that the person of Mr. Franco (or of Mr.

**23**

Fernandez, for that matter) was at any time touched by any of the detectives. Additionally, although the train to New York for which the travellers had tickets was scheduled to arrive at 9:28 A.M., about thirteen minutes after the initial contact between all of the actors in the instant drama, the search as described in the depositions could not have consumed more than a few seconds. The court is unimpressed with any claim that the will of the defendant herein was overborne by the proximity of the search to the impending arrival of the Amtrack train, assuming it to be precisely on schedule (a phenomenon that frequently does not occur).

Upon the issue of consent, the Court is of the opinion that the evidence before it sufficiently demonstrates that the consent was given freely and voluntarily rather than as a submission to apparent police authority. This conclusion is reached notwithstanding the absence of an express direction to the travellers that upon their refusal of consent to search they were free to travel upon their way. A common sense interpretation of the facts at hand reveals no reason for the defendant to have concluded that he could not have turned upon his heel and left the area. It can be left only to sheer speculation to determine just what would have happened had Mr. Franco attempted to leave without permitting the search. Decisions of law cannot be predicated upon nothing more substantive than one's gut reaction to a given situation.

The Court is of the opinion that the consent to search the luggage was general in nature and not limited as suggested by the defendant. The statement attributed to the defendant by which he indicated his permission to search his luggage, i.e., "You can look", is totally devoid of any words of qualification. Had he stated that the officer could look into the luggage but that he was not to examine the contents of any containers therein found, a different proposition would have been before the Court; but, just as trial counsel must do with witnesses, the facts must be taken as they actually occurred rather than as one would have preferred that they occur. It is no longer subject to argument that consent to search luggage carries with it consent to search closed canisters found within the luggage so searched. *U.S. v. Ross,* 102 S.Ct. 2157 (1982); *Wargin v. State,* 418 So.2d 1261 (Fla. 4th DCA 1981). By neither saying nor doing anything to prevent the officers from examining the contents of the container found within his luggage, Mr. Franco forfeited the right to complain after the fact. *Wargin v. State, supra.*

## CONCLUSION

For the reasons hereinabove expressed, the Motion to Suppress of Defendant Gilberto Franco is DENIED.