## STATE OF FLORIDA v. SHOR

Case No. 83-6446 CF

Seventeenth Judicial Circuit, Broward County

February 29, 1984

## APPEARANCES OF COUNSEL

**Chris Pole,** State Attorney's Office, for plaintiff.
**F. Robbins, Esq., Weiner, Robbins, et al.,** for defendant.

## OPINION OF THE COURT

J. LEONARD FLEET, Circuit Judge.

Defendant, Michael Lee Shor, on June 17, 1983, entered the terminal of Delta Airlines at Hollywood/Ft. Lauderdale International Airport bearing only one small piece of luggage. Mr. Shor entered one of the ticket lines and awaited his turn to receive service from the ticket agent. While waiting to be served, Mr. Shor was observed by Vicki Cutcliff and Steven Gaffney, both plainclothes detectives with the Broward County Sheriff's Office, to unduly scan the area of the terminal. His perceived observations appeared to the detectives to be more intensive than that of the usual airport passenger who casually scans an area while waiting for time to pass. Mr. Shor was also observed to be sweating inordinately for an air conditioned area, notwithstanding the time of the year when this event occurred.

Once Mr. Shor was in the ticket line, Mrs. Cutcliff and Mr. Gaffney noticed that Mr. Shor's body was trembling. Because their suspicions were now aroused, Mr. Gaffney took up a position in the ticket line directly behind Mr. Shor in order to better observe Mr. Shor's activities. Mr. Shor purchased, for cash, a one way ticket to New York City, first class; his bag was checked by him with the ticket agent.

Upon observing the foregoing events, Mrs. Cutcliff and Mr. Gaffney positioned themselves in such a fashion that Mr. Shor would walk by them on the way to the boarding area for Delta Airlines. When Mr. Shor did, in fact, walk past them, Mrs. Cutcliff spoke to him so as to identify herself as being with the Broward Sheriff's Office. She displayed her badge and identification card, the latter bearing her picture. Mr. Gaffney, at the same approximate time, duplicated the actions of Mrs. Cutcliff. When Mr. Shor acknowledged their presence, Mr. Gaffney inquired if Mr. Shor had a minute to speak with them to which Mr. Shor responded in the affirmative. Mr. Gaffney then explained that he and Mrs. Cutcliff were narcotics officers and requested Mr. Shor to show his airline ticket and some independent identification. Mr. Shor promptly produced his ticket for examination but denied that he had any other type of identification. The ticket was briefly examined by Mr. Gaffney and promptly returned to Mr. Shor.

Upon returning the ticket to Mr. Shor, Mr. Gaffney explained, in more detail, the nature of the work he and Mrs. Cutcliff were

**171**

attempting to do, specifically the interception of illegal transportation of narcotics. Mr. Gaffney asked for permission to search Mr. Shor's luggage, at the same time advising Mr. Shor of his right to refuse such request. Mr. Shor agreed to the search of his luggage and Mrs. Cutcliff departed the immediate area in order to retrieve Mr. Shor's handbag. Both Mrs. Cutcliff and Mr. Gaffney noticed that Mr. Shor became more visibly nervous while the above described events were occurring. In fact, with the progression of each step in the matter now before the Court, right up to the point where the contraband was ultimately handed over to Mr. Gaffney by Mr. Shor, Mr. Shor's nervous state increased in what to the Court seems to be almost geometric proportions.

While Mrs. Cutcliff went to retrieve Mr. Shor's luggage, he was told by Mr. Gaffney that there was a room available for the search. Mr. Gaffney walked toward the small room and Mr. Shor followed him. Entry into the room was obtained by Mr. Gaffney manipulating the combination door lock according to a code. Once inside the room, the door closed itself by virtue of the attachment thereto of a self-closing device. Mrs. Cutcliff entered the room, carrying Mr. Shor's handbag, at about the same time as the two gentlemen entered.

As soon as Mrs. Cutcliff put the handbag on the floor, Mr. Gaffney conducted the search thereof. There were very few items of clothing in the handbag and no drugs. During this brief period of time in the small room, Mr. Shor was becoming much more anxious, e.g., his stomach was palpitating, his voice was broken (evidenced by an inability to speak calmly), he was sweating profusely, his body was trembling.

Not finding any drugs in the handbag, and upon observing the physical characteristics of Mr. Shor (as described above), Mrs. Cutcliff requested Mr. Shor to consent to a pat down search of his person. After a brief hesitation, Mr. Shor raised his hands and stated his lack of objection to the body pat down. Mr. Gaffney felt what he deemed to be an unusual bulge in the crotch of Mr. Shor's pants. Mr. Gaffney asked Mr. Shor to hand over whatever was causing the bulge. Mr. Shor hesitated for about fifteen seconds, shuffling around in a nervous fashion on his feet, looking at the ceiling and at the door (which was still closed) but not responding either physically or verbally to Mr. Gaffney's request. More suspicious than ever at this point, Mr. Gaffney told Mr. Shor to surrender the object in his pants because Mr. Gaffney had enough probable cause to believe that he was carrying contraband, whatever its nature. It was obvious to Mr. Gaffney that Mr. Shor did not want to surrender whatever it was that was in Mr. Shor's pants. Mr. Gaffney then told Mr. Shor that the object was to be immediately

172

given to him, or Mr. Gaffney would take it from Mr. Shor's person. Mr. Shor then handed over the suspected object, which object was the package of cocaine now sought to be suppressed.

## CONCLUSIONS OF LAW

The resolution of the issue now before the Court, i.e., whether the search of the person of Mr. Shor is legally defensible, requires that attention be paid to several different aspects of the very complex field of law that has developed around the Fourth Amendment of the United States Constitution and Article I, Section 12, of the Constitution of the State of Florida. That Florida adheres to the decisions of the United States Supreme Court in the interpretation of the search and seizure portion of its constitution is no longer in question. Article I, Section 12, of the Florida Constitution as amended in 1982.

## LUGGAGE SEARCH

The initial confrontation between Mr. Shor and the two officers gives the Court no trouble. It is clear from the evidence that Mr. Shor was promptly told that he could decline the meeting and the search of his luggage. However, what seems to be missing from this important initial dialogue is express advice to Mr. Shor by the law enforcement officers that he could not only decline the search but he could also proceed to leave the airport if he so desired. Such two-pronged test was clearly stipulated in *U.S. v. Mendenhall,* 100 S.Ct. 1870 (1980) as being an important criterion toward which the trial courts must look when resolving the issues apparent in a case such as that now before the Court.

Mr. Gaffney testified that he and Mr. Shor gained access to the little storage room where the luggage search was to take place by Mr. Gaffney's utilization of a code to unlock the combination lock on the entry door which, once opened, closed itself behind the parties when they entered the room. From the record before the Court, it appears as though no one informed Mr. Shor as to how, or whether, he could exit the room without the assistance, or permission, of the law enforcement officers. It is, in the opinion of the Court, reasonable to conclude that the sense of confinement within the storage room (described by Mrs. Cutcliff to be approximately eight feet by fifteen feet) was prominent within the mind of the accused. Such conclusion is easily drawn from the description given by both officers of the rapidly deteriorating emotional state of the accused herein.

Prior to entering the storage room, consent had been obtained from Mr. Shor, in the relatively open lobby of the ticket area of the

**173**

terminal. Such openness is not to be overlooked when addressing the issue of consent to the handbag search and, concomitantly, the obvious confinement of the storage room is not to be overlooked when addressing the issue to the pat down of Mr. Shor's person followed by the repeated direct order to surrender the object contained within his pants that caused the "unusual bulge" in the crotch area thereof. The Court is of the opinion that, even in the absence of being told that he could leave the airport if he so wished when initial contact was made with him by the law enforcement officers, Mr. Shor legally consented to the search of his luggage. The Court is satisfied that no temporary seizure occurred when the officers made their initial contact with Mr. Shor. *Cavalluzzi v. State,* 409 So.2d 1108 (3rd DCA 1982). The question of whether Mr. Shor legally consented to the pat down of his person and the seizure of the contraband concealed thereon is not so easily resolved.

## BODY SEARCH IN STOREROOM

The significance of the missing statement to Mr. Shor that he was free to leave any time he so decided is emphasized by the language found in *State v. Champion,* 383 So.2d 984 (4th DCA 1980) viz:

". . . The actual evidence was simply that two police officers approached the defendant and identified themselves. They told the defendant they were involved in an investigation of drug trafficking and explained that their job was based only on general public cooperation. They explained that the defendant would have to consent to the search before it would be performed and that he did not have to give his consent. The testimony was that the defendant readily and spontaneously consented to the request to search by the officers. *Both officers stated defendant was free to go at any time . . . ."* (emphasis added)

As noted in *Champion,* supra, the taint of illegality engendered by a prior unlawful arrest or detention can be removed when the detainee receives proper warning prior to a subsequent search. Id., at page 985. It follows, therefore, that a search following a lawful detention may be constitutionally unsound if improper procedures are employed by the detaining officer. In the case at bar, Mr. Shor was informed that he could refuse the search of his luggage. When it came to the pat down and search of his person, however, he was not informed of either his right to refuse the request or of his right to leave the storage room once the search of his luggage was complete. Because of the paucity of facts contained in the opinion of the Fourth District Court of Appeals in *Iapichino v. State,* 435 So.2d 871 (1981), this Court is unable to

174

determine its applicability to the case at bar. However, by implication, the *Iapichino* court ruled that the verbal consent given by the accused while in the private room was valid, a situation that is not present herein as will be seen below.

Mr. Gaffney have Mr. Shor no alternative but to surrender the object concealed in his pants. In fact, Mr. Gaffney advised Mr. Shor that, should Mr. Shor not hand over the concealed object, Mr. Gaffney would remove it himself. It was only after such threat was made that Mr. Shor removed the object from his pants and delivered it into the hands of Mr. Gaffney. Although Mr. Shor was not formally arrested until after the cocaine had been handed over to Mr. Gaffney, he was in, at least, *de facto* custody. Consent given by one in *de facto* custody to allow law enforcement officers to search a constitutionally protected area is not lawful consent in the absence of notification by the officers to the subject of the subject's right to refuse the search. *Pirri v. State*, 428 So.2d 285 (4th DCA 1983). Even if such consent is deemed to have been freely given, if the consent is limited in nature, the subsequent search is necessarily limited in scope to the extent of such limitation. *Leonard v. State*, 431 So.2d 614 (4th DCA 1983).

The searches in this case having been conducted without benefit of a warrant, the burden is upon the State to prove, by clear and convincing evidence, that the consent given and the search conducted pursuant thereto were lawful. *State v. Champion*, 383 So.2d 984 (4th DCA 1980); *Leonard v. State*, 431 So.2d 614 (4th DCA 1983); *Bumper v. North Carolina*, 88 S.Ct. 1788 (1968); *Andress v. State*, 351 So.2d 350 (4th DCA 1977); *Bailey v. State*, 319 So.2d 22 (Fla. 1975). Where there is a mere acquiescence to apparent police authority, the State has not discharged its burden of proof. *Bumpers v. North Carolina*, supra. When a law enforcement officer tells a subject that the officer can force the disclosure of an object concealed in a constitutionally protected area if there is no consent forthcoming, the subsequent act of delivery of the concealed object by such person is not free and voluntary. *Bailey v. State*, supra.

This Court is firmly of the opinion that Mr. Gaffney unequivocally informed Mr. Shor that Mr. Gaffney would, himself, take the object from the crotch area of Mr. Shor's pants if Mr. Shor did not, himself, hand over the concealed object. In *M.J. v. State*, 399 So.2d 996 (1st DCA 1981), such threatening statements were deemed sufficient to remove any suggestion of the exercise of free will when marijuana was handed over. The mere demand that a subject disclose or produce a concealed object, under circumstances where the subject is without freedom to depart or refuse and not run the risk of suffering adverse

**175**

consequences, is treated as a search. *M.J. v. State,* supra; *Hunt v. State,* 371 So.2d 205 (2d DCA 1979); *J.R. v. State,* 428 So.2d 786 (2d DCA 1983). Thus, even without benefit of an arrest, Mr. Shor was already the subject to a seizure in the legal sense, a seizure for which there was no foundation in law. The seizure being unlawful, the fruits thereof cannot be relied upon by the State as justification thereof. *Bumper v. North Carolina,* supra.

## DECISION OF THE COURT

The foregoing considered it is

ORDERED and ADJUDGED that:

1. The initial contact between Mr. Shor and the law enforcement officers was not a seizure within the ambit of the Fourth Amendment of the United States Constitution or the meaning of Article I, Section 12, of the Constitution of the State of Florida.

2. The search of Mr. Shor's luggage was lawful, his consent thereto having been freely and voluntarily given.

3. Neither the pat down of the exterior of Mr. Shor's clothing nor the subsequent removal by him of the cocaine from the crotch area of his pants were free and voluntary acts made after a knowing and intelligent waiver by Mr. Shor of his constitutional safeguards against reasonable searches and seizures.

4. The evidence obtained by the State as a result of the aforementioned unlawful search and seizure are hereby suppressed and may not be utilized in the prosecution of Mr. Shor in the matter now pending before the Court.