ECKERSTROM, Chief Judge, dissenting:
¶ 26 In Valenzuela II , our supreme court addressed whether law enforcement agencies could have believed in good faith that a suspect's acquiescence to the "implied consent" admonition was sufficient to secure consent-valid under Fourth Amendment standards-for a warrantless blood draw. 239 Ariz. 299, ¶¶ 31-35, 371 P.3d 627. That analysis necessarily focused on whether binding precedent at the time of Valenzuela's blood draw would have placed those agencies on notice that "consent given solely in acquiescence to the admonition" might not be constitutionally valid. Id. ¶ 33. There, the court identified the then-pertinent precedents as Campbell v. Superior Court In and For Maricopa, 106 Ariz. 542, 546, 479 P.2d 685 (1971), and State v. Brito , 183 Ariz. at 535, 539, 905 P.2d 544 (1995) ; cases that it concluded "sanctioned use of the admonition." Valenzuela II , 239 Ariz. 299, ¶¶ 32-33, 371 P.3d 627. Accordingly, the Court held that the state acted in good faith. Id. ¶ 35.
¶ 27 Here, we address the same question with reference to markedly different binding precedent: Ms. Weakland was arrested in 2015, several years after the time of Mr. Valenzuela's arrest. Id. ¶ 4 (Valenzuela arrested in August 2012). Between those arrests, our supreme court issued its opinion in Butler , 232 Ariz. 84, 302 P.3d 609. That case rejected, for the first time, the state's theory that it could "imply" constitutionally valid consent from the suspect's decision to drive on Arizona's roads. Id. ¶¶ 17 -18 ; see Valenzuela II , 239 Ariz. 299, ¶ 25, 371 P.3d 627 (citing Butler to reject state's argument that consent could be implied from driving in Arizona). And, in applying that new understanding, the court's reasoning plainly suggested that the implied consent admonition was not alone adequate to secure voluntary consent. Butler , 232 Ariz. 84, ¶ 20, 302 P.3d 609.
¶ 28 Because Butler thus announced a marked departure from our state's prior precedent addressing the procedure for a constitutionally valid warrantless blood draw, I cannot agree with my colleagues that Valenzuela II resolves the application of the good-faith exception here. Instead, we address a novel question in this case that Valenzuela II did not entertain: whether, after Butler , law enforcement agencies could have continued to believe in good faith that acquiescence to the implied consent admonition was sufficient to demonstrate voluntary consent under Fourth Amendment standards.
¶ 29 In so doing, we must be mindful of the correct legal standards in applying the good-faith exception. The state bears the burden of establishing that it violated the defendant's constitutional rights in good faith. Havatone , 241 Ariz. 506, ¶ 19, 389 P.3d 1251. And, as our supreme court has clarified, it does not meet that burden by merely showing that the unconstitutional act had not yet been expressly forbidden. Id. ¶ 29. Rather, when binding precedent predating the police practice renders that practice one of "dubious constitutionality" or when the pertinent precedent addressing the practice is manifestly "unsettled," the logic of the exclusionary *453 rule applies and the evidence secured by unconstitutional means must be suppressed. Id. (explaining that application of the good-faith exception in such circumstances would give "law enforcement officials ... little incentive to err on the side of constitutional behavior"). Thus, if case law, existing at the time of the draw of Weakland's blood, cast doubt on whether acquiescence to the advisory equated to constitutionally valid consent, the state is not entitled to the benefit of the good-faith exception.
¶ 30 We must therefore confront what Butler held. There, the state argued "that every Arizona motorist gives 'implied consent' under § 28-1321 and the tests administered under the statute are [therefore] not subject to a Fourth Amendment voluntariness analysis." Butler , 232 Ariz. 84, ¶ 9, 302 P.3d 609. Specifically, the state maintained that Arizona's implied consent law, as described in the advisory, either "constitutes an exception to the warrant requirement or satisfies the Fourth Amendment's requirement that consent be voluntary." Id. ¶ 17.
¶ 31 Our highest court bluntly characterized these arguments as "unconvincing" and clarified how it would view the application of the Fourth Amendment to DUI blood draws in future cases: "We hold now that, independent of § 28-1321, the Fourth Amendment requires an arrestee's consent to be voluntary to justify a warrantless blood draw." Id. ¶ 18 (emphasis added).
¶ 32 As the court's own language in that holding suggests, this upended prior understandings of blood draw procedure in Arizona DUI cases. Previous cases had expressly or implicitly accepted that the implied consent process itself satisfied all Fourth Amendment concerns. See Valenzuela II , 239 Ariz. 299, ¶¶ 32-33, 371 P.3d 627 (analyzing pre- Butler cases). Indeed, by holding otherwise in Butler , the supreme court reversed our opinion, which had stated, in conformity with prior Arizona jurisprudence, that "the informed consent statute presents no Fourth Amendment issue." State v. Butler, 231 Ariz. 42, n.6, 290 P.3d 435 (App. 2012) (citing previous Arizona cases accepting this principle).
¶ 33 In so reversing, the supreme court expressly held that an officer's compliance with Arizona's implied consent law was not sufficient alone to establish constitutionally valid consent to a blood draw: "Contrary to the State's argument, a compelled blood draw, even when administered pursuant to § 28-1321, is a search subject to the Fourth Amendment's constraints." Butler , 232 Ariz. 84, ¶ 10, 302 P.3d 609, citing McNeely, 569 U.S. at 144, 133 S.Ct. 1552 (compelled blood draw taken pursuant to Missouri's implied consent law subject to Fourth Amendment's restrictions on warrantless searches). Further, the court emphasized that a defendant's consent to any warrantless blood draw would be assessed under traditional constitutional standards for voluntariness. Id. ¶ 13.
¶ 34 As the state's arguments in Butler demonstrate, Arizona law enforcement agencies had persistently relied on the DUI suspect's acquiescence to the § 28-1321 advisory (the "implied consent admonition")[6] as the exclusive basis for conducting a warrantless blood draw. To such agencies, the holding of Butler should have raised a very prominent red flag. Until Butler , the implied consent admonition had never been tasked with independently demonstrating a suspect's consent to a warrantless search under traditional Fourth Amendment voluntariness standards. Rather, as its content plainly demonstrates, the admonition had been designed to advise suspects of their legal obligation to submit to blood testing under Arizona's implied consent law-and to secure their acquiescence to that requirement.
¶ 35 After the supreme court's holding in Butler , any agency seeking to comply with evolving constitutional standards should have logically evaluated whether an advisory designed for one purpose (securing compliance with Arizona implied consent law) would coincidentally fulfill another (demonstrating voluntary consent to a search). For the reasons that follow, that inquiry would not have been reassuring.
*454 ¶ 36 First, in Butler , the supreme court's reasoning plainly demonstrated that submission to the admonition would not alone suffice to demonstrate voluntary consent. 232 Ariz. 84, ¶¶ 20-21, 302 P.3d 609. Indeed, the court affirmed the trial court's conclusion that the suspect, Tyler, had not voluntarily consented to the blood draw. Id. ¶ 21. It did so notwithstanding its recognition that Tyler had submitted to the admonition. Id. ¶ 20. That admonition, it pointedly observed, had been both read and explained to him. Id . In short, Butler not only squarely held that state implied consent law did not constructively establish constitutionally valid consent; it unsurprisingly found that the tool designed for advising a defendant of that law, the implied consent admonition, was inadequate alone to secure voluntary consent. Id.
¶ 37 Arguably, the court's reasoning went further than that. In a paragraph devoted to itemizing the reasons that "sufficient evidence supports the juvenile court's finding that [the juvenile] did not voluntarily consent to the blood draw," the court apparently listed the officer's reading of the implied consent admonition as a factor showing involuntariness . Id. In so doing, it chose to quote the sentence of the admonition most incompatible with the notion that its hearer could lawfully refuse consent: "You are, therefore, required to submit to the specified tests." Id. I would submit that the implication of this paragraph-in the context of an express holding that plainly stated the implied consent law no longer sufficed to establish consent-should have caused law enforcement agencies some pause.
¶ 38 At minimum, the supreme court's reasoning in Butler foreshadowed its ultimate holding in Valenzuela II : that the implied consent admonition, far from establishing voluntary consent, actually constituted an assertion of lawful authority that "effectively proclaimed that Valenzuela had no right to resist the search." Valenzuela II , 239 Ariz. 299, ¶ 22, 371 P.3d 627. Even assuming arguendo that Butler did not imply any conclusion that the admonition was overtly coercive, that case placed police agencies on plain notice that a defendant's acquiescence to the admonition would not alone establish voluntary consent under traditional Fourth Amendment standards.
¶ 39 Yet, the instant case demonstrates the Oro Valley Police Department persisted in using a procedure that relied exclusively on such acquiescence to secure consent to conduct blood draws. If it did so because it neglected to stay abreast of evolving case law, that failure would constitute "systemic negligence." See Havatone , 241 Ariz. 506, ¶¶ 21-24, 389 P.3d 1251 (good-faith exception does not apply where agency fails to consider existing precedent that casts constitutional doubt on police practice); State v. Kjolsrud , 239 Ariz. 319, ¶ 20, 371 P.3d 647 (App. 2016) (law enforcement agencies expected to "be aware of 'reasonable' interpretations of existing case law"), quoting State v. Mitchell , 234 Ariz. 410, ¶ 31, 323 P.3d 69.
¶ 40 On the other hand, any state agency that was alert to evolving precedent-and that sought to conform its search procedures to the holding in Butler -would review the content of the implied consent admonition and evaluate its suitability to establish voluntary consent. Such an inquiry could not avoid considering whether the language of the admonition was logically or semantically compatible with securing voluntary consent from a suspect.
¶ 41 Nor could any agency earnestly assess the constitutionality of its blood draw search procedure without considering Bumper , 391 U.S. at 548-50, 88 S.Ct. 1788. That case turned on the distinction between voluntary consent and submission to an officer's claim of lawful authority. Id. It unambiguously held that an officer's demand to search, given under color of legal authority, was not compatible with a state claim that a suspect had voluntarily consented. Id. Bumper could not be easily overlooked by any agency conducting a review of its practices under Butler . Bumper was the very case cited in Butler for the standard that consent must be "freely and voluntarily given." Butler , 232 Ariz. 84, ¶ 19, 302 P.3d 609.
¶ 42 For the above reasons, a serious review of police practice after Butler should have generated doubts about the voluntariness of any acquiescence to the implied consent admonition. If those doubts did not arise *455 from the semantic disharmony between the words "require" and "submit" when compared to the words "voluntary" and "consent," they should have arisen upon reading longstanding, and clearly pertinent, jurisprudence from the United States Supreme Court.
¶ 43 The majority maintains, however, that "the law does not require law enforcement to make legal assessments our courts have not made." And, it asserts that "at the time of Weakland's arrest, the courts of this state had not concluded the admin per se admonition was coercive or otherwise negated consent after Butler ." It supports that conclusion by citing jurisprudence from an inferior Arizona court, issued after the time of Weakland's arrest, which found acquiescence to the admonition an act of voluntary consent. See supra ¶19 (citing Valenzuela I and Arizona Court of Appeals cases following it under principles of stare decisis).
¶ 44 In essence, the majority asks: If some reasonable appellate judges could later find no constitutional infirmity with the admonition after Butler , how could we hold the state to any higher standard? But this intuitively appealing argument overlooks the express holding of Butler , provides an incomplete assessment of the subsequent case law, and implicitly assesses good faith under an incorrect standard.
¶ 45 To be sure, police agencies need not make legal assessments our courts have not made. See Kjolsrud , 239 Ariz. 319, ¶ 20, 371 P.3d 647 (law enforcement agencies not "expected to anticipate developments in the law"), quoting Mitchell , 234 Ariz. 410, ¶ 31, 323 P.3d 69. But law enforcement does have a duty, if it later seeks to claim good faith, to adapt to our state supreme court's express holdings and the clear implications of the court's reasoning. As discussed, Butler unambiguously held that the state's implied consent law did not itself establish voluntariness-and it proceeded to find a lack of voluntariness notwithstanding Butler's acquiescence to the implied consent affidavit.
¶ 46 The majority is correct that the Butler opinion did not expressly hold that the admonition was affirmatively coercive. But Butler could be correctly cited for the proposition that the implied consent admonition was not sufficient alone to facilitate voluntary consent.
¶ 47 To the extent the majority suggests that case law post-dating Weakland's arrest should inform our assessment of the state's good faith in drawing Weakland's blood, it fails to articulate comprehensively the weight of that jurisprudence. Subsequent to the holding in Butler , only two courts published opinions, unconstrained by stare decisis, that squarely addressed whether the language of the implied consent admonition was compatible with constitutionally valid consent: this division of the Arizona Court of Appeals (in Valenzuela I ) and the Arizona Supreme Court (in Valenzuela II ). This court agreed with the state, in a divided decision, and held that it was compatible. The Arizona Supreme Court held unanimously that it was not.
¶ 48 In all, five justices and one judge who addressed the issue held that the implied consent affidavit was incompatible with securing voluntary consent. Only two judges held otherwise. That blunt head count-that most jurists ultimately rejected the state's theory-does little to assist the state's current contention that it could have previously proceeded without harboring doubts about the constitutionality of its practice.
¶ 49 The majority emphasizes two court of appeals decisions that did not address the question of whether the language of the admonition was compatible with voluntary consent. Compare Okken , 238 Ariz. 566, ¶¶ 14-25, 364 P.3d 485 (Arizona's implied consent statute or scheme , imposing negative consequences for refusing a blood test, did not render consent involuntary) and Pena, No. 2 CA-CR 2013-0241 (defendant's decision to provide consent, after previously withholding it, not coerced) with Valenzuela II , 239 Ariz. 299, ¶¶ 22-28, 371 P.3d 627 (admonition not compatible with consent because its language implies officers have authority to command acquiescence). In citing these cases, my colleagues overlook that our appellate courts do not commonly address alleged constitutional infirmities not raised or briefed by the parties on appeal. See *456 Calnimptewa v. Flagstaff Police Dep't, 200 Ariz. 567, ¶ 24, 30 P.3d 634 (App. 2001) (appellate opinions should not be read as authority for matters not "specifically presented and discussed"). For that reason, neither case can be read as implicitly holding that the language of the admonition was compatible with securing voluntary consent to a blood draw. Neither court was asked to address that question.
¶ 50 Properly understood in the context of a good-faith analysis, the pertinent history of Arizona jurisprudence can be summarized as follows. In Butler , the Arizona Supreme Court clearly drew the constitutionality of the state's practice here into question-even if it did not expressly hold it coercive. After Butler , the state's use of the admonition persisted in the face of, at best, unsettled law.
¶ 51 At that time, a careful review of the admonition's language, together with an appraisal of the pertinent longstanding jurisprudence, Bumper , should have raised substantial doubts about the constitutionality of the practice. In subsequent jurisprudence, most Arizona jurists tasked with squarely addressing the question in the first instance-and all five justices of our highest court-rejected the state's claim that acquiescence to the admonition demonstrated voluntary consent. Valenzuela II , 239 Ariz. 299, ¶ 25, 371 P.3d 627 ; Valenzuela I , 237 Ariz. 307, ¶¶ 50, 57, 350 P.3d 811 (Eckerstrom, C.J., dissenting).
¶ 52 None of this jurisprudential history gives comfort to the state's claim that it could, after Butler , assume it was securing blood draws in conformity with constitutional standards. Rather, by persisting in the use of the admonition as the sole basis for consent, it disregarded a plain risk that the practice would not pass constitutional muster.
¶ 53 In this legal context, we are provided two potential standards for assessing the good-faith exception. Davis instructs that when the prevailing law at the time of the state's unconstitutional practice had "specifically authorize[d]" the practice, the good-faith exception applies unless the police officers exhibit "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." 564 U.S. at 251, 257, 131 S.Ct. 2419. By contrast, as our supreme court clarified in Havatone , the state enjoys no such protection from the exclusionary rule when the law pertaining to the practice is "unsettled." Havatone , 241 Ariz. 506, ¶ 29, 389 P.3d 1251. Under that circumstance, when the pre-existing law suggests it is a "close" case or the constitutionality of the practice is "dubious," the exclusionary rule must apply to encourage the police to err on the side of constitutional behavior. Id.
¶ 54 After Butler , the law was unsettled. Nonetheless, the state persisted in its prior practice. In so doing, it disregarded a substantial risk that its practice violated a suspect's Fourth Amendment rights. To apply the good-faith exception under such circumstances would only encourage law enforcement to continue with dubious practices until a court finds them expressly unconstitutional. See id. (rejecting application of good-faith exception in "close" cases, when law unsettled, because otherwise police "would have little incentive to err on the side of constitutional behavior"). Under the scenario here, suppression would serve as an effective deterrent, causing law enforcement agencies to more exactingly stay abreast of developments in the law and faithfully review their procedures in accordance therewith. See Davis , 564 U.S. at 237, 131 S.Ct. 2419.
¶ 55 When we exclude or suppress evidence in a criminal case, the social costs of doing so are distressingly concrete. An individual defendant, and perhaps others similarly situated, may escape responsibility for crimes they have committed. Davis , 564 U.S. at 237, 131 S.Ct. 2419. Indeed, as here, the ill-gotten evidence often demonstrates a defendant's guilt. For this reason, we decline to impose the exclusionary rule when law enforcement violations of constitutional rights occurred in good faith. And, when we must exclude or suppress evidence, it is never a happy judicial task. See id. But it is inevitably in criminal cases that important constitutional boundaries between the state and the individual are articulated and enforced. Mapp v. Ohio , 367 U.S. 643, 655-56, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). I fear we abdicate our duty to guard those boundaries when we characterize law enforcement practices, continuing in the face of their dubious *457 constitutionality, as good faith. I, therefore, respectfully dissent.

In Butler , the supreme court aptly refers to the advisory, alternatively called the "admin per se" admonition, see Valenzuela II , 239 Ariz. 299, ¶ 5, 371 P.3d 627, as the "implied consent admonition." Butler , 232 Ariz. 84, ¶ 20, 302 P.3d 609.