RENDERED:  NOVEMBER 21, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1436-MR

COMMONWEALTH OF KENTUCKY                                                APPELLANT


APPEAL FROM TODD CIRCUIT COURT
v.       HONORABLE JOE W. HENDRICKS, JR., JUDGE
ACTION NO. 22-CR-00031


CHRISTOPHER B. STOKES                                                        APPELLEE


OPINION
VACATING AND REMANDING

** ** ** ** **

BEFORE:  CALDWELL, COMBS, AND EASTON, JUDGES.

EASTON, JUDGE:  The Appellee (Stokes) is charged with Murder resulting from a motor vehicle accident.  The Commonwealth alleges Stokes was driving under the influence (DUI) of drugs other than alcohol at the time of the accident.  The circuit court suppressed the blood test results obtained by a police officer at a hospital where Stokes had been taken by ambulance.  In granting the suppression,

the circuit court relied on the effect of the implied consent warning which may have been read to Stokes before he consented to the blood test.

Because the circuit court essentially applied a presumption to be rebutted or "overcome" in its totality of the circumstances analysis, we vacate and remand for further proceedings. As we are vacating the decision, we also note for purposes of remand that the circuit court proceedings did not include consideration of the good faith exception to the exclusionary rule. This must be considered as a matter of law depending on the facts found, because the exclusionary rule may be applied only for the purpose of deterrence of future police conduct.

## FACTUAL AND PROCEDURAL BACKGROUND

An effective evaluation of the totality of circumstances requires the presentation of evidence of all the circumstances. The circuit court's suppression decision in this case was hampered by the limited information presented, although much more information clearly was available. We will outline what was presented during the approximately forty minutes of testimony and identify important referenced information we do not find in the record.

At about 11:30 a.m. on the morning of August 14, 2020, Stokes was involved in a head-on collision with a vehicle driven by Suzanne Reynolds.[1]

---

[1] Sue Reynolds was 68 years old. She was a pastor at the Bethel Cumberland Presbyterian Church in Clarksville, Tennessee.

Reynolds died at the scene. There were officers at the scene before Stokes was taken by ambulance to the nearby Tennova hospital just across the border[2] in Tennessee. None of these officers provided evidence, and very little about what they had observed was offered through the officer in charge of the investigation at the initial suppression hearing. A review of this initial hearing indicates that it was to be just a beginning to the gathering of evidence for the motion. Only two officers in court that day gave testimony, and they were subject to recall.

There were seven further court appearances after the partial evidentiary hearing on September 26, 2022. No further evidence or information was provided to the circuit court about the circumstances of the consent given by Stokes.

As an example of missing evidence, KSP[3] Trooper (Tpr.) Brian Graves, who apparently was not present for the initial hearing, spoke with an unidentified witness at the scene. This interaction was recorded, but that recording is not in the record. Stokes apparently told the witness that he had sneezed just prior to the collision, but Stokes also said that the collision occurred in his lane of travel. We do not know what else this recording may have disclosed about observations of Stokes by others, or statements made by Stokes at the scene. We

---

[2] The accident occurred in Todd County, Kentucky, which borders Tennessee to the south.

[3] Kentucky State Police.

also do not know whether Stokes was aware of the fatality, although it would seem unlikely that Stokes would not have been aware of the seriousness of the collision before he was removed from the scene.

The lead investigating officer, KSP Sergeant (Sgt.) Nicholas Rice, did not arrive at the scene until after Stokes had been taken away by ambulance. Sgt. Rice directed KSP Tpr. Michael Dennis to go to the Tennova hospital to obtain a blood sample from Stokes. Sgt. Rice explained that protocol required seeking a blood test when a fatality had occurred.

Tpr. Dennis is an eighteen-year veteran with the KSP. His experience as an officer had been with alcohol-related DUI cases, not cases involving other drugs. He went to the hospital and met with Stokes. No one suggests that Stokes was under arrest at the hospital or that Tpr. Dennis in any way detained Stokes. The circuit court even remarked that an arrest in Tennessee could be seen as "kidnapping" because of the lack of jurisdiction for a Kentucky officer to arrest in Tennessee.

Tpr. Dennis asked Stokes for his consent to a blood test. When asked if he read the then current implied consent warning to Stokes before seeking the blood test, Tpr. Dennis replied: "to the best of my knowledge, I did."[4] No

_____

[4] Record (R.) 9-26-22 at 3:00:25-33.

evidence was offered from the nurse[5] who performed the blood draw about the circumstances of the draw, including the nature of any statements read to Stokes. Stokes himself did not provide any evidence about whether he heard the implied consent information or how it impacted him.

Tpr. Dennis described Stokes as "pretty jovial." Stokes did not seem "really concerned" about the situation. Tpr. Dennis said: "I don't know if he was fully aware of what happened."[6] Tpr. Dennis recalls telling Stokes he had a right to consult an attorney, which he chose not to do. Stokes consented to the blood draw. The testing of that blood would reveal the presence of fentanyl.

One of the few items discussed during the hearing is a hospital record form about the blood draw. This form is a single page. It is page 110 out of 137 pages of hospital records. The other 136 pages are not part of this court record. Unless these records were reviewed in total by the circuit court, that court could not know if a blood draw occurred separately for medical treatment reasons and was thus inevitable. This could have impacted the suppression decision.

Another important question remains unanswered. Stokes's counsel assumed a fact not in evidence and asked the following question of Tpr. Dennis:

---

[5] One of the attorneys informed the circuit court at a subsequent court appearance that the nurse was not cooperative. A subpoena often has the effect of altering cooperation attitudes.

[6] R. 9-26-22 at 3:04:14-56.

"Are you aware that he (Stokes) was administered fentanyl at the hospital for pain?"[7]  If this is true, which would have provided the required good faith basis for the question and which also could have been easily confirmed by the missing hospital records, it may be a circumstance relevant to the consent given.

In its Order granting Stokes's motion to suppress the blood test results, the circuit court found that Tpr. Dennis was "under no suspicion that [Stokes] was under the influence of any substances"[8] when he sought consent, despite the uncontradicted testimony of Tpr. Dennis that he thought Stokes was impaired with his additional description of Stokes's having "glossy" and "wide open" eyes and that Stokes was talking "quite frequently."[9]

Regardless of any factual finding as to observed impairment, the circuit court basically acknowledged that there were no circumstances to support a finding of involuntariness other than the possible impact of the implied consent warning.[10]  The circuit court concluded that "[b]ecause the Commonwealth [has] not met its burden of proof to show the attenuation of the coerciveness of the Warning," and thus had not "overcome" the warning, the suppression motion was

---

[7] R. 9-26-22 at 3:17:37-43.

[8] R. at 74.

[9] R. 9-26-22 at 3:21:11-3:25:12.

[10] R. at 81.

granted.[11]  Indeed, at one point, the circuit court drew an analogy that the "colorably lawless coercion" of the implied consent warning "infected" the consent given.[12]  The Commonwealth appeals.  We will specifically revisit the evidence or lack of it in our analysis.

## STANDARD OF REVIEW

"The standard of review for a trial court's ruling on a suppression motion is two-fold.  We review the trial court's factual findings for clear error, and deem conclusive the trial court's factual findings if supported by substantial evidence.  The trial court's application of the law to the facts we review de novo." *Williams v. Commonwealth*, 364 S.W.3d 65, 68 (Ky. 2011) (citations omitted).

## ANALYSIS

We need to start with the implied consent process as it once was and now is in Kentucky.  Like every other state, Kentucky adopted an implied consent statute.  The idea is that for the privilege[13] of operating a vehicle in the Commonwealth every driver gives consent to one or more tests if an officer has

---

[11] R. at 83.  In its Order, the circuit court repeatedly used the terms "attenuate" and "overcome."

[12] R. at 78.

[13] Driving is a privilege, not a right.  *See Commonwealth v. Howard*, 969 S.W.2d 700, 702 (Ky. 1998).

reasonable grounds to believe the driver has violated DUI laws. KRS[14] 189A.103. The statute specifies options for blood, breath, or urine for the tests.

If a driver decides essentially to withdraw the implied consent by refusing to take a requested test, there are consequences, such as a suspension of a driver's license. KRS 189A.105(2)(a)1.a. The consequence that became problematic under the Fourth Amendment was the imposition of criminal charges and penalties if a test was refused. As it might have applied to this case, if Stokes had refused consent, then he could have faced a doubling of the minimum jail time *if* he had been convicted of a DUI arising out of this accident. KRS 189A.105(2)(a)1.b. It would have been his second such conviction.[15] He could have been required to serve a minimum of fourteen days instead of seven. KRS 189A.010(5)(b).

Implied consent changed because of *Birchfield v. North Dakota*, 579 U.S. 438, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016). *Birchfield* reinforced the rule that a search warrant is the default requirement of the Fourth Amendment subject to exceptions like consent. While it was not unreasonable under the Fourth Amendment to compel tests of breath and urine, there is a difference with a blood

---

[14] Kentucky Revised Statutes.

[15] Stokes was convicted of his first DUI in 2014. *Commonwealth v. Christopher B. Stokes*, Butler District Court, Case No. 14-T-00367.

test. Such a test involves an invasion of the body and a withdrawal from it. The United States Supreme Court decided that a person could not be compelled to give a blood sample without a search warrant. *Birchfield*, 579 U.S. at 474.

Birchfield did not eviscerate all aspects of implied consent. It called into question only certain aspects of the implied consent statutes around the country. Specifically, the Court in *Birchfield* held that consent could not be compelled on pain of committing a separate criminal offense because of the refusal, which is what North Dakota had done. *Id*. at 477. Kentucky did not create a separate criminal offense for a refusal, only an enhanced penalty *if* the person was separately convicted of a DUI charge. Thus, it was unclear whether *Birchfield* applied to Kentucky's implied consent penalties.

This Court analyzed Kentucky's implied consent process after *Birchfield* in *Commonwealth v. Brown*, 560 S.W.3d 873 (Ky. App. 2018). We distinguished *Birchfield* because Kentucky's implied consent law did not create a new criminal offense for a refusal to give a test; it merely enhanced a penalty *if* the person was subsequently convicted of a DUI offense. *Id*. at 878. This Court followed the precedent of *Brown* in an unpublished case, *Larue v. Commonwealth*, Nos. 2017-CA-000719-DG and 2017-CA-000783-DG, 2019 WL 103959 (Ky. App. Jan. 4, 2019). In *Larue*, we said that "[t]he warning itself, although defective, is not inherently coercive." *Id*. at 4. The warning is only of a "possibility." There

was no guaranteed jail time for any crime because of refusing to consent. *Id*. (quoting from *Commonwealth v. Hernandez-Gonzalez*, 72 S.W.3d 914, 917 (Ky. 2002)).

We pause here to make an important point to which we will return. A well-trained officer in 2020 would have understood *Brown* as the state of the law in Kentucky. In 2020, the *Birchfield* decision did not apply to Kentucky's implied consent warning of possible doubled jail time. And requesting consent was required in cases involving fatalities if it was even possible that felony charges might follow, regardless of the involvement of alcohol or other drugs. *Simpson*, *infra*.

The law changed in 2021 with the Kentucky Supreme Court's decision in *Commonwealth v. McCarthy*, 628 S.W.3d 18 (Ky. 2021). *McCarthy* expanded *Birchfield* by holding that the enhancement of a possible penalty was sufficiently punitive to be the same as a criminal offense for a test refusal. Thus, the penalty provision of doubling the minimum sentence could not be enforced. *Id*. at 32-34.

The defendant in *McCarthy* did not consent to a blood test. As a result, the impact of a defective implied consent warning on consent was not an issue addressed in that case. We must circle back to review what the courts must

-10-

do when consent is given after the implied consent warning. We first revisit *Birchfield*.

One of the defendants in *Birchfield* gave consent after an implied consent warning had been read to him. The Court in *Birchfield* did not automatically invalidate the consent given, but instead remanded the case because the voluntariness of the consent "must be determined from the totality of all the circumstances[.]" 579 U.S. at 478 (internal quotation marks and citation omitted). The Court in *Birchfield* borrowed this phrase from its well-established precedent of *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

The question is whether the will of the defendant was overborne in the particular case with many potential factors to be considered. 412 U.S. at 226. When commenting on decisions about voluntariness, the Court in *Schneckloth* noted that "none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." *Id*. No factor or combination of factors are "in and of themselves determinative." *Id*. at 227.

As the state first tasked with deciding how partially unenforceable implied consent warnings figured into the totality of the circumstances analysis, North Dakota rejected the notion that the implied consent warning held any special place among the circumstances. *See North Dakota v. Fleckenstein*, 907 N.W.2d

-11-

365 (N.D. 2018). But we need not rely on decisions from another state on this issue. Kentucky has long accepted and applied a proper totality approach.

The only question is voluntariness of the consent. "The question of voluntariness turns on a careful scrutiny of all the surrounding circumstances in a specific case." *Cook v. Commonwealth*, 826 S.W.2d 329, 331 (Ky. 1992) (citing *Schneckloth*, *supra*).

Just days prior to the initial and incomplete hearing before the circuit court in this case, the Kentucky Supreme Court reinforced this totality rule in the specific context of a defective implied consent warning followed by consent. *Haney v. Commonwealth*, 653 S.W.3d 559 (Ky. 2022). "In light of *Birchfield* and *McCarthy*, we remand this case to the trial court to consider whether Haney's consent was voluntary under the totality of the circumstances which included the warning that if she refused the blood test and if she were convicted of DUI, her mandatory minimum jail sentence would be doubled." *Id*. at 568.

At one point in *Haney*, the Court used the phrase: "the warning, even if it were coercive." *Id*. at 565. This comment indicates that something which may be inherently coercive is not necessarily coercive in fact when all circumstances are considered together. Applying any presumption about the effect of the warning is not consistent with a true totality of the circumstances approach. In *Haney*, the

warning was not identified as a factor which required "attenuation" to find voluntariness. It did not have to be "overcome."

The circuit court relied primarily[16] on *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). *Bumper* makes an important general point about coercion: "Where there is coercion there cannot be consent." 391 U.S. at 550. But this does not mean that even inherent coercion from any particular circumstance equates with coercion in fact to result in an involuntary consent.

The Court in *Bumper* considered all circumstances of that case in making its decision, and the circumstances were clearly distinguishable from this case. The officers in *Bumper* went to the home of a citizen and announced that they had a warrant to search the premises. The resident let them search. The announcement of a warrant removed any issue of consent. Letting the officers in was just "acquiescence to a claim of lawful authority." 391 U.S. at 549.

The officers in *Bumper* had a search warrant, but the state did not rely on the warrant. *Id*. at 550 n.15. This raises serious suspicion that the warrant was invalid thus leading the state to rely solely on a specious claim of consent. The Kentucky Supreme Court has similarly condemned a claim of consent resulting

---

[16] The circuit court also discussed *Amos v. United States*, 255 U.S. 313, 41 S. Ct. 266, 65 L. Ed. 654 (1921). We choose not to lengthen this Opinion by discussing this even older and distinguishable case. It does not add to the point made with the use of *Bumper*.

from intentional deception by the police. *Krause v. Commonwealth*, 206 S.W.3d 922 (Ky. 2006).

*Bumper* and *Krause* also involve entering a home. "The 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' *United States v. U.S. Dist. Court for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972)." *Barrett v. Commonwealth*, 470 S.W.3d 337, 341 (Ky. 2015). This circumstance of entering a home is not presented here.

The circuit court equated the improper show of force by the officers in *Bumper* to the mere reading of the warning in this case. They are not the same. Indeed, the Court in *Haney* rejected the argument that the reading of a warning is a "show of force." *Haney*, *supra*, at 565.

We do not reverse this case but remand it. It is not the place of the appellate courts to decide the factual question of voluntariness. As we have indicated, the biggest problem here was a legal flaw in the evaluation of the totality of the circumstances. On remand, the circuit court must consider all circumstances without any automatic preference for one over the other. A secondary problem is the lack of clearly available evidence in the formulation of the findings of fact of all the circumstances.

We have heard the concerns of the trial courts that the appellate courts often send cases back to them without direction, sometimes using the unhelpful phrasing: "for proceedings not inconsistent with this opinion." But there is a fine line to draw between directions for remand and advice on how to proceed. We will try to stay on our side of that line with the following observations about the relevant circumstances as revealed from what is indicated in this record and how the law applies to these circumstances in assessing voluntariness.

Stokes was *not* charged with DUI, contrary to the statements made by the Commonwealth in its brief. The direct indictment in this case included a report of "no true bill" as to a DUI charge and charged Murder only.

One relevant fact not yet clearly established is whether Stokes was aware of the death or serious injury to Reynolds at the scene. If so, the circuit court must consider the coerciveness of the implied consent warning in such a circumstance. Would Stokes be as concerned about seven additional days if he were ever to be charged and convicted of a DUI second offense (which ironically he was not) or would he be more concerned about the penalties of a homicide charge, which would be unaffected by any implied consent warning of DUI penalties?

The circuit court noted that the officer who gathered the blood sample had no reason to suspect that Stokes was impaired. Aside from the evidentiary

issue of finding support for that factual conclusion which we have already noted, we further recognize that this may be largely irrelevant to the right of the officer to seek consent for a blood test in a fatality case. Still, Stokes's impaired condition might be relevant to Stokes's capacity to give voluntary consent.

Fatality cases are different from other potential DUI cases. As already stated in the limited evidence in this case, the police must follow a protocol in such cases to seek blood draws from the drivers. The Kentucky Supreme Court has previously quoted from Kentucky State Police General Order OM-E-1, Section F, which is tied to KRS 189A.105(2)(b). *Simpson v. Commonwealth*, 653 S.W.3d 855, 864 (Ky. 2022). Subsection 1 of the General Order directs officers to request testing if there is a "possibility" of a driver being charged with a felony, which is not necessarily limited to cases involving impairment by intoxication. *See Brown v. Commonwealth*, 174 S.W.3d 421 (Ky. 2005). If consent is not given, then the officer is to seek a search warrant, which presumes probable cause can be shown. But there is no requirement of probable cause just to ask for consent. *Simpson*, *supra*.

The focus on the implied consent by the circuit court included discussion by the parties and witnesses as to when the implied consent should be

read or when it was in fact read in this case.[17]  Although the asking for consent in all fatality cases may not require it, there may be occasions when an officer suspects a DUI charge may be coming along with other charges, and the officer will err on the side of caution by reading the implied consent, which by now should have been reworded to avoid situations like the present case from happening in the future.  At any rate, it looks like the officer probably read the consent to Stokes at some point, although he did not clearly state his memory of doing so.

Stokes is quite right to state that the burden of establishing voluntariness of his consent is on the Commonwealth and must be proven by a preponderance of the evidence.  *Cook*, *supra*, at 331.  Stokes did not testify in the suppression hearing.  Of course, he did not have to.  A defendant may make a tactical choice to present no evidence in a suppression hearing to not help the Commonwealth meet its burden.

But defendants should be reminded of Kentucky's protection of their rights to still enable them to participate in suppression issues.  In *Shull v. Commonwealth*, 475 S.W.2d 469 (Ky. 1971), Kentucky established the right of a defendant to testify in a suppression hearing while limiting cross-examination to

---

[17] During the questioning of Tpr. Dennis, Stokes's counsel suggested that the hospital form may have indicated that the implied consent was read *after* the blood was drawn.  If so, it is hard to imagine how the implied consent warning played any part in the consent already given.

the suppression issue alone and further limiting the use of the defendant's statements in later trial proceedings. Some of the cases we have discussed involved consideration of testimony from defendants about their reactions to the police conduct in question. These defendants did not want to leave uncontested the circumstances about the voluntariness of their actions, and they were not required to give up their constitutional right not to be compelled to be a witness against themselves on the issue of guilt or innocence.

The requirement of a totality of the circumstances evaluation should not too frequently burden the trial courts with trial-like hearings. The rules of evidence do not apply to such hearings. KRE[18] 1101(d)(1). *See Oakes v. Commonwealth*, 320 S.W.3d 50, 56 (Ky. 2010). For example, there is no requirement for a separation of witnesses for such a hearing, although this could be ordered at the discretion of the trial court judge as was done in this case. Hearsay statements of what others said to the investigating officers may be permitted as was partially presented in this case. Nothing would prevent the reluctant nurse in this case from being interviewed by either side, and her statements then being offered during the suppression motion hearing. Yet, in some cases, the parties may choose to have all witnesses testify fully and in person for completeness of the record.

---

[18] Kentucky Rules of Evidence.

Finally, the purpose of the exclusionary rule must be considered. It does not matter if the parties or the circuit court raised or decided the question of good faith. It is part of the legal standard for suppression of any evidence and may be raised on appeal. *Commonwealth v. Opell*, 3 S.W.3d 747, 752 (Ky. App. 1999).

The exclusionary rule was created by the United States Supreme Court. Its purpose was and is only to deter future misconduct. The rule creates no personal constitutional right for a defendant. And when an officer has acted consistently with then applicable appellate authority, exclusion cannot be applied to retroactively enforce a change in the law, of which the officer could not have known at the time. *See Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011).

This Court has recently applied the good faith aspect of the exclusionary rule to a situation of an implied consent warning in a DUI case with other charges because another vehicle was involved, as in this case. *Towne v. Commonwealth*, No. 2024-CA-0133-MR, 2025 WL 2679349 (Ky. App. Sep. 19, 2025) (now final but unpublished). Other states have similarly applied the good faith qualification to the exclusionary rule in the context of warrantless blood draws. *See*, *e.g.*, *Tennessee v. Reynolds*, 504 S.W.3d 283, 310-15 (Tenn. 2016) (including discussion of *Parker v. Commonwealth*, 440 S.W.3d 381 (Ky. 2014)).

We could proceed with the application of this legal question, but because of the state of the record in this case and our concerns about the completeness of the factual circumstances and findings, we vacate rather than reverse. Such an important legal rule should be applied to a thorough factual assessment of all the circumstances.

## CONCLUSION

The voluntariness of the consent given by Stokes must be determined by an evaluation of the totality of all the circumstances. Such totality contains no presumptions. It does not change the Commonwealth's burden by including any one factor to be "overcome." It does not require "attenuation" of the implied consent warning. Because of our concerns about the findings of the applicable circumstances in this case, we VACATE and REMAND this case to the Todd Circuit Court. In addition to any further evidentiary evaluation of the factual circumstances, the circuit court must apply the good faith exception to the exclusionary rule to the facts ultimately found.

CALDWELL, JUDGE, CONCURS.

COMBS, JUDGE, DISSENTS AND FILES SEPARATE OPINION.

COMBS, JUDGE, DISSENTING: I file this dissent because of the words cited by the majority from *Bumper*, *supra*: "Where there is coercion there cannot be consent."

In a scholarly analysis of the evolution of implied consent for Fourth Amendment purposes, the majority opinion notes that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Barrett*, *supra*. *Birchfield*, *supra*, takes that analysis from the invasion of the home to the penetration into the bloodstream. Because of the intrinsically intrusive nature of a blood test, either a warrant or valid consent is required. *Birchfield* holds that "motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense." *Birchfield*, 579 U.S. at 477.

The police officer in this case did not seek a warrant; and the language that he utilized in asking Stokes for consent contained the warning that refusal to grant the blood draw could be used against him in court -- **and that in the event of his conviction, he would be subject to a mandatory minimum jail sentence twice as long as the mandatory minimum sentence imposed if he were to submit the test**.

This was a perfectly correct statement of the governing statute. However, in this context, statement of the statutory legal consequences of

enhanced punishment for refusal to consent is precisely the coercion that *Birchfield* declared as nullifying the voluntariness of the consent.

The Commonwealth argues that the trial court erred in its assessment of the totality of the circumstances. However, it acknowledges that whether consent is a product of coercion **is a question of fact specifically within the trial court's purview** and that it (the Commonwealth) bears the burden to establish -- by a preponderance of the evidence -- that consent was indeed voluntary. The Commonwealth also concedes that the officer's implied-consent warning had a coercive effect upon Stokes. Nevertheless, it contends that other factors surrounding Stokes's interaction with the police officer weigh in favor of a finding that his consent was entirely voluntary.

The trial court carefully analyzed the circumstances. There was never an allegation or insinuation of bad faith on the part of the officer. But the trial court granted the motion to suppress the evidence based on its conclusion that the consent had been rendered involuntary under the clear precedent of *Birchfield*. The trial court specifically found that the language of the implied-consent warning was "effectively a demand under color of law that [Stokes] must comply with the request for a blood draw." It found as follows:

> Trooper Dennis asserted to Mr. Stokes that the implied consent statute, later held to be invalid as an unconstitutional abridg[]ment to due process, required Mr. Stokes to consent to the blood draw or be subject to

more severe criminal penalties. Mr. Stokes had no reason to believe that the implied consent statute was invalid, so he "consented" to the blood draw in an attempt to avoid additional criminal and administrative sanctions. . . . [T]here has been no showing by the Commonwealth that the consent was given for any other reason.

In an effort to show "other factors" involved with the police exchange that arguably mitigated any coercive effect of the implied-consent warning, the Commonwealth identified several factors: Stokes was not under arrest; he was not in restraints; he was not transported to the hospital by police cruiser; and he was not threatened in any manner. Stokes was alert; appeared to understand what was happening; and did not ask for an attorney. In fact, Trooper Dennis described Stokes as being "almost jovial."

After carefully reviewing these other factors, the trial court found that there was no persuasive countervailing evidence to indicate that Stokes did anything other than acquiesce to the Trooper's coercive request. The court observed, "Regardless of the custody issue, this bare showing has not overcome the coercive nature of the implied consent warning so as to establish that the consent was voluntary." In short, the court was not satisfied that the Commonwealth had met its burden to establish voluntariness of consent.

Consent is valid only where it is freely given. *Krause v. Commonwealth*, 206 S.W.3d 922, 924 (Ky. 2006); *Cook v. Commonwealth*, 826

S.W.2d 329, 331 (Ky. 1992). To summarize, in order to determine whether Stokes's consent was freely given, the trial court considered the totality of the circumstances. It did not err by considering the Trooper's implied-consent warning to be intrinsically coercive. Its findings of fact were sufficiently supported by the evidence and do not merit -- or require -- a remand.

Once again, I would note that the Commonwealth could readily have sought a warrant for the blood test, which it did not opt to do, relying instead on consent -- the voluntariness of which it failed to establish.

Therefore, I would affirm.

BRIEFS FOR APPELLANT:

Russell Coleman
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General
Frankfort, Kentucky

BRIEF FOR APPELLEE:

B. Alan Simpson
Bowling Green, Kentucky